CAISSE NATIONALE DE CREDIT AGRI-COLE, a French banking corporation, Plaintiff–Appellee, Cross–Appellant,

v.

CBI INDUSTRIES, INCORPORATED, a Delaware corporation, Defendant–Appellant, Cross–Appellee.

Nos. 95–2814, 95–2708.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 8, 1996.

Decided July 24, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 20, 1996.*

*Judge Rovner did not take part in the consider- ation of this appeal.

Michael P. O'Brien, Thomas A. Doyle (argued), Michael L. Morkin, Baker & McKenzie, Chicago, IL, for Caisse Nationale de Credit Agricole in No. 95–2707.

Michael A. Pollard, Michael P. O'Brien, Thomas A Doyle (argued), Michael L. Morkin, Baker & McKenzie, Chicago, IL, for Caisse Nationale de Credit Agricole in No. 95–2814.

Julie A. Harms, Hinshaw & Culbertson, Chicago, IL, Robert V. Shannon (argued), Carla M. Rogers, Bell, Boyd & lloyd, Chicago, IL, for CBI Industries, Inc. in No. 95–2708.

Julie A. Harms, Hinshaw & Culbertson, Chicago, IL, Francis J. Higgins, Paul M. Bauch, Robert V. Shannon (argued), Carla M. Rogers, Bell, Boyd & Lloyd, Chicago, IL, for CBI Industries, Inc. in No. 95–2814.

Before ESCHBACH, FLAUM, and MANION, Circuit Judges.

MANION, Circuit Judge.

■ Interest rate "swaps" are agreements to exchange fixed-rate and floating-rate interest obligations. Typically, each party agrees to make interest payments to the other calculated by reference to an agreed amount, the "notional amount" in swap parlance. One party pays interest on the notional amount at a fixed rate; the other at a floating rate. When the agreement expires, the obligations are netted and the party owing the greater amount, if any, pays the excess. Swap agreements are used to manage interest rate risk or to speculate on interest rate movements.[1] This case involves a dispute over the deadline to exercise an option (a "swaption") to bring a swap agreement into effect. ·

I.

Caisse Nationale de Credit Agricole ("Credit") is a French bank with its principal place of business in Paris. Chameleon Finance Company, B.V. ("Chameleon") is a Dutch subsidiary of CBI Industries, Inc. ("CBI"), a Delaware corporation. The district court found that both Chameleon and CBI have their principal places of business in Oak Brook, Illinois. On February 18, 1991, Credit and Chameleon entered into a swap agreement. Effective immediately, the parties agreed to exchange floating and fixed-rate interest obligations calculated on the basis of a notional amount of $35 million (Canadian) for the next three years, ending on January 16, 1994. That same day, Credit also purchased from Chameleon an option giving it the right to enter a second swap agreement to begin on January 16, 1994, the date the first would expire, and end on January 16, 1996. The deadline for exercising the option was January 16, 1994.

These agreements—the two swaps and the option to bring the second swap into effect—were initially struck over the telephone and then confirmed in two separate documents. The first contained the details of the 1991–94 swap. The second, sent from Credit's offices in New York City to Chameleon's offices in Oak Brook, Illinois, spelled out the particular terms of the 1994–96 swap and stipulated that the deadline for exercising the option that would bring it into effect was "5:00 p.m. EST up to and including January 16, 1994." In a letter to Credit dated March 12, 1991, CBI guaranteed Chameleon's obligations.

The January 16, 1994 deadline for the option fell on a Sunday, and the next day was a federal bank holiday commemorating the

---

1. Business Week has described swap agreements in this manner: "In a typical interest-rate swap, one party agrees to pay a variable interest rate to another party in exchange for receiving a fixed rate payment. For example, say a company that has issued $100 million in 10–year, fixed-rate 7% bonds thinks interest rates will fall. It could enter into a swap contract where it agrees to make variable-rate interest payments for 10 years to another party, equal to three percentage points over the two-year Treasury rate of 4%. In exchange, it would get fixed payments of 7%— equal to the interest payments it is paying bondholders. If rates fall, so do the company's payments—even though its bondholders are still receiving 7%. The other party to this deal, say an insurance company, may have issued floating-rate notes and wanted to protect against a rise in rates. The swaps dealers-mostly banks—that create, market, and broker these deals have made billions." David Greising, *Chicago's Swaps Sweepstakes*, Business Week, June 14, 1993.

birthday of Dr. Martin Luther King, Jr. On Tuesday, January 18, 1994, Credit's New York office telephoned Chameleon in Oak Brook, Illinois and attempted to exercise the option. Chameleon balked, telling Credit the option had expired on January 16 and that therefore it would not honor the terms of the 1994–96 swap. CBI confirmed its position the next day, January 19, 1994, in a letter to Credit.

On February 7, 1994, Credit sued Chameleon and CBI in federal district court alleging anticipatory breach of the option contract and seeking appropriate damages. Jurisdiction was predicated on diversity of citizenship and an estimated amount in controversy in excess of $3 million. See 28 U.S.C. § 1332(a)(2). Over Credit's objection, CBI and Chameleon were permitted to move immediately for summary judgment without answering the complaint. They assured the district court that the "only" issue before the court was "an extremely simple one": "[W]hether or not [Credit] exercised the option in a timely fashion." Hence, "no discovery [would be] necessary." In their statement of undisputed facts, CBI and Chameleon specified that New York law governed both the swap and option agreements. After deposing one of defendants' employees, Credit filed a cross-motion for summary judgment on all counts.

On June 14, 1994, the district court granted summary judgment to Credit and denied defendants' motion. The district court held that section 25 of New York's General Construction Law [2] extended the option deadline to January 18, 1994 from the original date of January 16 because the original day was a Sunday and the next a public holiday. Hence, the court concluded that on January 18, 1994 Credit timely exercised the option. The record is unclear, but apparently at this time the court also invited the parties to propose a method for calculating damages.

Defendants moved to certify the matter for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). On July 22, 1994, the district court denied the motion and ordered defendants to submit a suggestion for the calculation of damages by August 26, 1994. That same day (July 22), Credit submitted a detailed estimate of damages. Instead of proposing its own damages calculation as instructed, defendants filed a brief arguing that Credit was not entitled to damages because, among other reasons, it had not given defendants notice of their failure to perform as required by the swap agreement. The court disagreed and on November 3, 1994 held that Credit was entitled to damages, though it disagreed with Credit's estimate. The court interpreted the swap agreement's notice provision as dictating that the date of suit (February 7, 1994) be used to calculate damages instead of, as Credit had argued, the date of repudiation (January 18, 1994). The court ordered the parties, and specifically Credit, to submit detailed estimates of damages consistent with its ruling. As directed, Credit filed new damages estimates. Defendants did not directly contest these figures, stating simply that "Defendants demur."

The court ruled by minute entry on the amount of damages, but before the entry was processed defendants, armed with new counsel, contested the court's subject matter (diversity) jurisdiction. They also claimed material evidence had not been presented and informed the court that on that basis they intended to file a motion for reconsideration. The court agreed to address the jurisdictional issue but asked counsel to delay the motion for reconsideration until after the question of jurisdiction was resolved.

---

**2.** New York General Construction Law (N.Y.G.C.L.) § 25(1) (McKinney 1994) provides:

1. Where a contract by its terms authorizes or requires the payment of money or the performance of a condition on a Saturday, Sunday or a public holiday, or authorizes or requires the payment of money or the performance of a condition within or before or after a period of time computed from a certain day, and such period of time ends on a Saturday, Sunday or a public holiday, unless the con-

tract expressly or impliedly indicates a different intent, such payment may be made or condition performed on the next succeeding business day, and if the period ends at a specified hour, such payment may be made or condition performed, at or before the same hour of such next succeeding business day, with the same force and effect as if made or performed in accordance with the terms of the contract.

After additional briefing, the district court found that because Chameleon was incorporated in the Netherlands, it was an alien for purposes of diversity jurisdiction regardless of the location of its principal place of business (Oak Brook, Illinois). This defeated diversity jurisdiction under 28 U.S.C. §§ 1332(a)(2) & (c)(1) because Chameleon, an alien, was impermissibly opposite Credit, another alien. However, the court agreed with both parties that the suit could proceed without Chameleon and so dismissed Chameleon without prejudice, curing the jurisdictional problem. The court held the dismissal did not invalidate or impair the award of summary judgment as to CBI's liability under the guarantee, reasoning that with the dismissal of Chameleon, the case against CBI had to be treated as within its diversity jurisdiction from the outset. The court thus reaffirmed its previous summary judgment ruling.

CBI then filed its motion for reconsideration alleging "manifest error of both law and fact" in the court's summary judgment ruling. The court denied the motion, holding that the additional factual information and legal arguments should have been put forth during summary judgment. On June 22, 1995, the district court denied CBI's belated motion for leave to amend its answer, which it had never filed, and entered final judgment for Credit in the amount of $3,307,036.09. CBI's motion to amend the judgment was also denied. CBI and Credit appeal.

## II.

On appeal CBI challenges the denial of its motion for reconsideration and the granting of summary judgment. Credit contests the district court's calculation of damages. We address each of these matters in turn.

### A.

After the district court resolved the jurisdictional issue and amended its order granting summary judgment, CBI filed a motion for reconsideration of the summary judgment order. CBI claimed that evidence material to the cross-motions for summary judgment had not been before the district court. Specifically, the motion for reconsideration raised three supposedly new facts: (1) that February 18, 1991, the date on which Credit and Chameleon traded the 1991 swap and formulated the option, was a holiday in New York (Washington's birthday) and Illinois (Presidents' day) but a regular business day in Toronto; (2) that the 1991 swap confirmation specified that Toronto business days governed the 1991 swap; and (3) that the documents Credit transmitted to CBI to confirm the option mistakenly omitted an addendum issued by the International Swap Dealers Association (ISDA), now known as the International Swaps and Derivatives Association. The district court denied the motion, noting that "CBI has not explained its reasons for failing to use [this] factual information ... in the months-old summary judgment phase of the case" despite that it was "clearly in existence when the parties briefed their summary judgment motions." The court held that "the proper time for CBI to make these arguments and offer this information was in response to plaintiff's motion for summary judgment, not in a motion to reconsider."

 As CBI freely admits on appeal, "Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present · newly discovered evidence." *Keene Corp. v. Int'l Fidelity Ins. Co.*, 561 F.Supp. 656, 665 (N.D.Ill.1982), *aff'd*, 736 F.2d 388 (7th Cir.1984); *see also Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir.1987) (quoting language in *Keene Corp.*). "Such motions cannot in any case be employed as a vehicle to introduce new evidence that could have been adduced during the pendency of the summary judgment motion." *Keene Corp.*, 561 F.Supp. at 665; *see also DeBruyne v. Equitable Life Assurance Soc'y*, 920 F.2d 457, 471 (7th Cir. 1990); *Manor Healthcare Corp. v. Guzzo*, 894 F.2d 919, 922 n. 4 (7th Cir.1990). To support a motion for reconsideration based on newly discovered evidence, the moving party must "show not only that this evidence was newly discovered or unknown to it until after the hearing, but also that it could not with reasonable diligence have discovered and produced such evidence [during the pendency of the motion]." *Engelhard Indus.*,

*Inc. v. Research Instrumental Corp.*, 324 F.2d 347, 352 (9th Cir.1963), *cert. denied*, 377 U.S. 923, 84 S.Ct. 1220, 12 L.Ed.2d 215 (1964). Disposition of a motion for reconsideration is left to the discretion of the district court, and its ruling will not be reversed absent an abuse of that discretion. *Billups v. Methodist Hosp.*, 922 F.2d 1300, 1305 (7th Cir.1991).

■■■ A party seeking to defeat a motion for summary judgment is required to "wheel out all its artillery to defeat it." *Employers Ins. of Wausau v. Bodi–Wachs Aviation Ins. Agency*, 846 F.Supp. 677, 685 (N.D.Ill.1994); *Ryan v. Chromalloy Am. Corp.*, 877 F.2d 598, 603–04 (7th Cir.1989). Belated factual or legal attacks are viewed with great suspicion, and intentionally withholding essential facts for later use on reconsideration is flatly prohibited. Reconsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion. *In Re Oil Spill*, 794 F.Supp. 261, 267 (N.D.Ill.1992), *aff'd*, 4 F.3d 997 (7th Cir.1993) (citing *Publishers Resource v. Walker–Davis Publications*, 762 F.2d 557, 561 (7th Cir.1985)); *see also Bally Export Corp. v. Balicar Ltd.*, 804 F.2d 398, 404 (7th Cir.1986) (a motion to reconsider is not the appropriate vehicle to introduce new legal theories).

■■ On appeal CBI candidly confesses that the new evidence it sought to present, although unknown to it during the pendency of the cross-motions for summary judgment, could have been adduced earlier. We agree. That the 1991 swap was agreed to on a holiday in two states and that it referenced Toronto business days were facts always readily available to CBI; a glance at the calendar and the agreement is all that was required to uncover them. Whether a matter of strategy or inadvertence, CBI's failure to submit these facts to the court during summary judgment foreclosed its motion for reconsideration.

■■ The same holds for the allegedly omitted option addendum, though for more detailed reasons. As we discuss below, CBI's theory of the case was that the option agreement could be understood only with reference to other documents, including those governing the intricate details of the underlying swap agreement. By contrast, Credit argued that the option was an independent contract whose terms and conditions did not require elucidation from other sources. The district court agreed with Credit, interpreting the option as a simple, autonomous contract. Thus, CBI's bid to introduce an allegedly missing addendum is not merely an effort to submit "new" facts, but more fundamentally an attempt to reargue its rejected legal theory that the option agreement cannot be read standing alone. This CBI cannot do. Again we emphasize, apart from manifest errors of law, reconsideration is not for rehashing previously rejected arguments. Close cases can be disputed on appeal. Moreover, we are not convinced that CBI could not "with reasonable diligence have discovered and produced" the allegedly missing addendum during the pendency of the motion for summary judgment. *Engelhard Indus., Inc.*, 324 F.2d at 352. With its legal theory dependent upon collateral sources, it was incumbent upon CBI to ensure that the district court was reviewing the proper documents. That it failed to do so is not so much evidence that CBI was caught by surprise, which CBI implies on appeal, as that it was content to do battle with the documents then before the court. In an unusual and risky maneuver, CBI declined to answer Credit's complaint and instead insisted on proceeding directly to summary judgment, alleging the case was "all based on facts presented by the plaintiff" and thus that "no discovery [would be] necessary." When that tactic failed, CBI retained new counsel who quickly discovered the alleged omission, confirming that "reasonable diligence" would have revealed it during the summary judgment phase.

■■ In a last-ditch effort, CBI asserts the court lacked jurisdiction when it entered its original summary judgment order. Thus, CBI claims, when it first suggested it would move for reconsideration the order was void, and it remained so until Chameleon was dismissed and the summary judgment order reinstated. CBI concludes that in effect the

court did reconsider and amend its ruling; it just refused to do so in light of CBI's additional evidence. This argument is undone by the simple fact that, as CBI frankly admits, CBI did not actually file its motion for reconsideration until *after* the court reissued its summary judgment order. True, the district court asked CBI to withhold its motion until the matter of jurisdiction was resolved. But that does not change the fact that CBI's motion for reconsideration was an effort to reopen a jurisdictionally valid order granting summary judgment so as to argue factual and legal points CBI previously could have raised. CBI's motion for reconsideration gains no validity merely because it was conceived prior to the resolution of a temporary jurisdictional glitch. The district court is entitled to "save" diversity jurisdiction by dismissing dispensable, non-diverse parties during the pendency of the proceedings. *See Stockman v. LaCroix,* 790 F.2d 584, 587 (7th Cir.1986); *cf.* 28 U.S.C. § 1653. The rationales for precluding belated attempts to reargue motions for summary judgment through motions for reconsideration remain in full force. Law of the case concerns, which are not necessarily dependent upon jurisdiction, also undermine CBI's position. *See* 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction* § 4478 (1981) (doctrine of law of the case allows court to rely on previous ruling with same parties on same issues, though doctrine not based on court's power to reconsider such issues); *Avitia v. Metropolitan Club of Chicago, Inc.,* 49 F.3d 1219, 1227 (7th Cir.1995) ("The doctrine of law of the case establishes a presumption that a ruling made at one stage of a lawsuit will be adhered to throughout the suit."). For these reasons we conclude the district court did not abuse its discretion in denying CBI's motion for reconsideration.

B.

The broad issue here and at summary judgment is whether Credit timely exercised its option. Under New York law, which below both parties agreed controls,[3] performance of a contract condition due on a Saturday, Sunday or public holiday is deemed timely if performed on the next succeeding non-holiday. *See supra* note 2. The rule can be avoided if "the contract expressly or impliedly indicates a different intent." N.Y.G.C.L. § 25(1). CBI disputes the applicability of this provision, but the parties seem agreed that to the extent it applies, the spartan terms of the option confirmation, standing alone, contain nothing expressly indicating a departure from the weekend/holiday rule. They also agree that by the terms of the statute, the weekend/holiday rule could not apply if the option agreement clearly reflected an intention by the parties to opt out of its terms. But there the consensus ends. Credit maintains that § 25 applies to options and that the option confirmation constitutes the entire option agreement. Credit therefore contends that its attempt to exercise the option on a Tuesday following a Sunday deadline and a Monday holiday was timely. CBI argues that the option contract does not authorize or require the payment of money or the performance of a condition, and thus by its own terms § 25 does not apply. But assuming § 25 does apply, CBI submits that the option contract includes the limited terms of the confirmation as well as the provisions of the Interest Rate and Currency Exchange Agreement ("IRCEA"), a swap industry form agreement governing the underlying swap. The IRCEA is incorporated by

---

3. CBI argues that the district court's ruling that New York law controls means the option must have been governed by a separate document that specified New York law. But no such meaning need be inferred. The formation and attempted exercise of the option agreement occurred between the New York and Chicago branches of Credit and the Oak Brook, Illinois offices of CBI and Chameleon. Absent a clear choice of law provision stating otherwise, the law of one of those two states would control. CBI stated in its uncontested facts and motion for summary judgment that New York law applied. Credit was indifferent because New York and Illinois have essentially the same weekend/holiday rule, though it has cited to Illinois case law for support both here and below. *See* Illinois Compiled Statutes, 5 ILCS 70/1.11 (1992). On appeal we need not address the choice of law issue because it makes no difference to the outcome which state's law governs. For the sake of continuity with the district court's ruling, we will mainly reference New York law.

reference in the option confirmation and provides a comprehensive system for adjusting dates that fall on non-business days. Conspicuously absent, CBI notes, is any rule adjusting the date for the exercise of an option. CBI concludes this silence is significant, evincing an intent that the option expiration date not be adjusted. In the alternative, CBI argues that because the IRCEA defined business days as Toronto business days, to the extent the expiration date is adjustable, the adjustment must be to the next Toronto business day. Dr. King's birthday is not commemorated in Canada, so the next business day and deadline would have been Monday, January 17, 1994, the day before Credit acted. Thus, CBI concludes, Credit missed the deadline for exercising the option.

 Though once considered somewhat distinct, *see Benedict v. Pincus,* 191 N.Y. 377, 84 N.E. 284 (1908), it is now established in New York that an option is a binding contract. *Clarke v. Caldwell,* 132 A.D.2d 171, 173, 521 N.Y.S.2d 851 (1987); *Shubert Foundation, Inc. v. 1700 Broadway Co.,* 173 A.D.2d 126, 129, 578 N.Y.S.2d 148 (1992) (option defined as " 'a contract to keep an offer open' ") (quoting 1 Williston on Contracts, 3d Ed., § 61A, p 198.). As such, options are subject to the customary rules of contract interpretation. *See, e.g., Willis v. Ronan,* 218 A.D.2d 794, 631 N.Y.S.2d 50, 51 (1995) (applying contract principles governing conditions precedent and offer and acceptance to options); *Meshel v. Phoenix Hosiery Co.,* 17 Misc.2d 1035, 1040, 184 N.Y.S.2d 525 (1957) (stock option plans governed by the "familiar principles of contract"); *Warfield v. Belanca Robe Corp.,* 186 Misc. 910, 912, 64 N.Y.S.2d 66 (Mun.Ct.1946) ("There is no question that [an] option to renew is enforceable under the general principles of the law of contracts.").

 Absent ambiguity, option contracts (like all contracts) are governed by the plain meaning of their language. "It is well settled that when a contract's language is unambiguous, a court will enforce its plain meaning rather than rewrite the agreement." *Costa v. District Nursing Association of Northern Westchester, Inc.,* 175 A.D.2d 274,

275, 572 N.Y.S.2d 727 (1991). The intent of the parties controls, but "the court must ascertain the intent of the parties from the plain meaning of the language employed, giving terms their plain, ordinary, popular and non-technical meanings." *Tigue v. Commercial Life Ins. Company,* 219 A.D.2d 820, 631 N.Y.S.2d 974, 975 (1995). "Where a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence." *Ruttenberg v. Davidge Data Systems Corp.,* 215 A.D.2d 191, 192–93, 626 N.Y.S.2d 174 (1995). "Mere assertion by one that contract language means something to him, where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract," does not create an ambiguity meriting extrinsic evidence. *Id.* (citation and quotation marks omitted). Moreover, "[i]t is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *W.W.W. Associates, Inc. v. Giancontieri,* 77 N.Y.2d 157, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639, 642 (1990) (citation and quotation marks omitted). This is because "[a]n analysis that begins with consideration of extrinsic evidence of what the parties meant, instead of looking first to what they said and reaching extrinsic evidence only when required to do so because of some identified ambiguity, unnecessarily denigrates the contract and unsettles the law." *Id.* 565 N.Y.S.2d at 444, 566 N.E.2d at 643.

 Despite the contractual nature of options, CBI contends that the weekend/holiday rule of § 25 does not apply because the option did not authorize or require the payment of money or the performance of a condition. Credit simply had a prepurchased right to exercise the option; no performance was required, CBI argues. New York case law is not extensive on this point, but at least two decisions have applied § 25 to option contracts. *Joannides v. Assimacy,* 216 App. Div. 133, 214 N.Y.S. 692 (1926), held that given its contractual nature, an option "is governed by section 25 of the General Construction Law." Critical to this holding was the court's characterization of the exercise of

an option as "tendering performance of the option," thus bringing it squarely within the statutory language of § 25. More recently, New York's highest court concluded that an option agreement payment due on a holiday was timely made the next day even though the option agreement provided that time of payment was of the essence. *Hirsch v. Lindor Realty Corp.*, 63 N.Y.2d 878, 483 N.Y.S.2d 196, 197, 472 N.E.2d 1024, 1025 (1984). This suggests that § 25 still applies to option contracts. Again, New York case law could be stronger, but the conclusion is not unreasonable. Because an option is "a contract to keep an offer open," 1 Williston on Contracts, § 61A, the offeree must do something to accept the offer. That required "something" can reasonably be seen as a "condition" (as that term is used in § 25) that must be performed for the offer to be accepted. *See* Restatement (Second) Contracts § 50 ("Acceptance of an offer is a manifestation of assent to the terms thereof made by the offeree *in a manner invited or required by the offer.*") (emphasis added); *see also id.* § 224 ("A condition is an event ... which must occur ... before performance under a contract becomes due."). Here the condition for acceptance was nothing more than timely notice. CBI's contention that Credit did not give timely notice is simply a claim that Credit failed to perform a condition necessary to exercise the option. Thus, by its terms § 25 can fairly be applied to this situation.[4]

The difficult question is whether the terms of the option spelled out in the option confirmation letter comprised the option agreement *in toto* or whether the particulars of the then-dormant swap agreement, including the IRCEA, were also part of the option contract. CBI urges the latter view on basically two grounds: First, the confirmation letter states that "[t]his [option] Confirmation supplements, forms part of, and is subject to, the Interest Rate Swap Agreement,

as amended and supplemented from time to time." CBI submits that this language confirms the parties' intent that the option be understood with reference to the terms of the IRCEA. Second, CBI contends that because of their inherent complexity an option on an international interest rate swap agreement cannot be governed by the meager details in a confirmation letter; it requires the precise terms of the IRCEA. CBI argues this is further indication that the parties intended the IRCEA to govern. For its part, Credit maintains that the portion of the confirmation detailing the terms of the option is complete and requires no further elucidation from the IRCEA.

We agree with CBI that the most natural reading of the confirmation is that it incorporates the IRCEA as part of the option contract. But the IRCEA tells us nothing about the deadline for exercising the option. It is relevant solely to define the terms of the offer that the option keeps open. In other words, the IRCEA pertains to the option contract because it is a necessary part of the swap agreement that will come into being *if* the option is exercised; it contains the details of an offer that Chameleon (and thus CBI), by issuing the option, agreed to keep open until January 16, 1994. But other than being a part of an agreement dependent upon the exercise of an option, as far as we can tell the IRCEA has little or nothing to do with options. That is why it is silent on the matter: it governs swap agreements, not contracts to hold open offers for swap agreements. Thus, contrary to CBI's position, the IRCEA's silence implies nothing about option deadlines. We assume a document with such comprehensive detail contains all the terms its drafters intended. Without compelling reasons directing otherwise, we decline the invitation to add additional terms to the IRCEA by decoding its silences. The more natural reading is that the IRCEA supplemented

4. Illinois law is in accord. *See, e.g., Providence Ins. Co. v. LaSalle Nat'l Bank,* 118 Ill.App.3d 720, 74 Ill.Dec. 208, 210–11, 455 N.E.2d 238, 240–41 (1983) (exercise of option received Monday following a Saturday exercise deadline was valid and consistent with the extension statute); *see also J.D. Brooks v. Hicks,* 230 Ga. 500, 197 S.E.2d 711, 712–13 (1973) (though time of the essence, option not terminated by optionee's failure to tender payment on Sunday deadline; Sunday rule entitles optionee to tender payment on the following day); *Watson v. Kresse,* 130 N.W.2d 602, 606 (N.D.1964) (under Sunday rule option exercised on Monday timely though deadline fell on Sunday).

and clarified the terms of the swap agreement and not of the option. Incorporation of the IRCEA served only to define the offer the option was preserving. Thus, although the details of the 1994–96 swap, including incorporation of the IRCEA, were specified in the confirmation, they were relevant to the option only insofar as they composed the offer the option contract committed to hold open for a specified time. The terms of the swap agreement itself are not at issue. We are concerned only with the time for exercising the option on the swap agreement.

Hence the plain language of the confirmation governs the deadline for exercising the option. This is paragraph two of the confirmation letter:

■■■ 2. The particular Rate Swap Option Transaction to which this confirmation relates is an option, the terms of which are as follows:

> Seller: CHAMELEON FINANCE COMPANY BV
> Buyer: CNCA GC [Caisse Nationale de Credit Agricole Grand Cayman]
> Trade Date: February 18, 1991
> Option Premium: None
> Expiration: January 16, 1994
> Option Exercise Period: Option is exercisable between 9:00 a.m. and 5:00 p.m. EST up to and including January 16, 1994.

This language gave Credit the right to exercise the option until 5:00 p.m. on Sunday, January 16, 1994. Since there is nothing express or implied in these terms that indicates an intent to contract out of § 25, we hold that New York law extended the time for Credit to accept the offer to Tuesday, January 18, 1994, the first nonholiday after the Sunday deadline and King holiday.

■■■ We acknowledge the practical problems of extending an expiration date for a Canadian interest rate swap agreement based on a New York statute and holiday. Though closed in New York on January 17, 1994 for the King holiday, the markets were open in Toronto, allowing Credit extra and valuable time to decide whether to exercise the option. It may well be that our holding affords Credit an unanticipated gain and that

a better approach would have been for the option and the underlying swap to be governed by the laws of the country whose currency is involved, as CBI suggests. But that is not what the parties agreed to, and an unanticipated benefit to one party is not a sufficient ground for us to rewrite the contract. The fact remains that the terms of the option contract evince no intent-express or implied—to alter the weekend/holiday rule. Chameleon and CBI are no strangers to these complex transactions. If the terms of the option as written and as governed by § 25 made no economic sense, they should have insisted on different ones. Departures from § 25 require no great effort; a simple sentence expressing the intent not to be governed thereby is sufficient. But it appears that neither side recognized the confusion the chosen expiration date would cause and so nothing was done to address it. That turned out to be unfortunate for CBI.

## C.

In calculating damages for repudiation of the option and the swap agreement, the district court used February 7, 1994, the date Credit filed suit, as the termination date of the contract. In its cross-appeal, Credit insists that January 19, 1994, the date Chameleon unequivocally repudiated the option and the swap agreement, should have been used instead. Credit claims the district court's methodology understates its damages by approximately $133,000.

The IRCEA, which we view as part of the swap agreement, provides rules governing terminations. As the district court noted, under the IRCEA a party seeking damages for an "Early Termination" must prove that an "Event of Default" occurred, and that it gave appropriate notice of an "Early Termination Date" to the other defaulting party. When a party commits an Event of Default, say failing to make a payment required by a swap or otherwise breaching the agreement, the nondefaulting party is required to give the defaulting party notice of the default within a specified time frame. The nondefaulting party can then designate any date "not earlier than the day such notice is effec-

tive as an Early Termination Date in respect of all outstanding Swap Transactions." This procedure allows some flexibility for curing defaults. If the default is not cured, the Early Termination Date becomes the date of breach for purposes of calculating contract damages.

■■■■■ Credit argues that these notice provisions do not apply in this case because Chameleon had repudiated the entire agreement. We agree. On January 19, 1994, the day after Credit attempted to exercise the option, Chameleon sent a letter to Credit stating:

> Your exercise [of the option agreement] is untimely and of no effect. The original swap agreement between Credit Agricole and Chameleon Finance having expired January 16, 1994 without timely exercise of the option, our mutual obligations under the swap agreement have now been satisfied and the agreement has been terminated.

That was a flat denial that the 1994–96 swap agreement had even come into effect. We held above that Credit timely exercised the option. Arguably that brought the swap agreement into effect despite Chameleon's repudiation. Or perhaps the repudiation of the option is best viewed as having aborted the swap agreement entirely, leaving Chameleon and CBI liable for the fair market value of the option on the date of repudiation. Either way, Credit was not obligated to give Chameleon notice that it considered Chameleon's unambiguous notice of repudiation a repudiation. Assuming Credit had binding notice obligations under the swap agreement, Chameleon waived them by its blanket repudiation of the entire agreement. "Waiver is 'an intentional abandonment or relinquishment of a known right or advantage which, but for such waiver, the party would have enjoyed.'" *Wolff & Munier, Inc. v. Whiting–Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir.1991), quoting *Alsens Am. Portland Cement Works v. Degnon Contracting Co.*, 222 N.Y. 34, 118 N.E. 210 (1917). Like any other contractual provision, the swap agreement's notice requirements can be waived. *Wolff & Munier, Inc.*, 946 F.2d at 1009. Chameleon's January 19, 1994 letter unequivocally declared that both parties had satisfied all obligations under the existing swap agreement and disavowed any additional obligations. Having explicitly renounced the rights and duties of the swap agreement, including those contained in the IRCEA, CBI may not now insist that Credit comply with its notice requirements. To the extent they ever existed, those rights have been waived. *Id.*

■■■■■ Moreover, even if the notice requirements were still binding, under these facts Credit would be excused from performing a futile act. As our colleagues on the Second Circuit have held, New York law provides that "'a party to a contract may be precluded from insisting on strict compliance by conduct amounting to a waiver or estoppel.'" *Id.* quoting *Peter A. Camilli & Sons, Inc. v. State*, 41 Misc.2d 218, 223, 245 N.Y.S.2d 521, 527 (Ct.Cl.1963); *see also Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc.*, 135 A.D.2d 891, 892, 522 N.Y.S.2d 292, 293 (3d Dept.1987) ("where it becomes clear that one party will not live up to a contract, the aggrieved party is relieved from the performance of futile acts or conditions precedent"); *Allbrand Discount Liquors, Inc. v. Times Square Stores Corp.*, 60 A.D.2d 568, 568, 399 N.Y.S.2d 700, 701 (2d Dept.1977) ("[o]nce it becomes clear that one party will not live up to the contract, the aggrieved party is relieved from the performance of futile acts"), appeal denied, 44 N.Y.2d 642, 405 N.Y.S.2d 1026, 376 N.E.2d 935 (1978). Other jurisdictions have also recognized this principle. *See, e.g., L.K. Comstock & Co. v. United Eng'rs & Constructors Inc.*, 880 F.2d 219, 232 (9th Cir.1989) (applying Arizona law, compliance with contractual notice provision not required where it would amount to a "useless gesture") (citing 2 Corbin on Contracts § 1266, p. 442 (C. Kaufman Supp.1984)); *Craddock v. Greenhut Construction Co.*, 423 F.2d 111, 115 (5th Cir. 1970) (under Florida law, contractual condition excused where it "was a useless gesture"). In light of the forthright repudiation, requiring Credit to give Chameleon or CBI notice of a default would have been a pointless gesture.

Therefore, the district court erred in calculating damages as of February 7, 1994, the date Credit filed suit. The proper date is January 19, 1994, the date Chameleon/CBI gave unequivocal written notice disclaiming any obligation under the option or swap agreement. We therefore remand to the district court for a redetermination of damages using January 19, 1994 as the date of default. In so doing we note that under New York law Credit is entitled to "expectation damages," which means Credit should be placed "in the same economic position it would have been in had both parties fully performed." *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 728–29 (2d Cir.1992); *see Menzel v. List*, 24 N.Y.2d 91, 97, 298 N.Y.S.2d 979, 246 N.E.2d 742 (1969).

### III.

The decision below is AFFIRMED IN PART, REVERSED IN PART, and this matter is REMANDED to the district court for further proceedings consistent with this opinion.