Mylan v. Zydus, No. S0041-09 CnC (Crawford, J., July 10, 2013)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

SUPERIOR COURT                                      CIVIL DIVISION
Chittenden Unit                                         Docket No.: S0041-09 CnC

MYLAN TECHNOLOGIES, INC.
and MYLAN INC.
       Plaintiffs

         v.

ZYDUS NOVELTECH, INC., SHARAD K. GOVIL,
CADILA HEALTHCARE, LTD., PANKAJ PATEL and
SUNIL ROY
       Defendants

### DECISION ON PLAINTIFFS' MOTION FOR RECONSIDERATION OF THE COURT'S MARCH 20, 2013 DISCOVERY ORDER

The Mylan plaintiffs (collectively, "Mylan"), seek reconsideration of the court's March 20, 2013 decision on defendants Zydus Noveltech, Inc. (Zydus) and Dr. Govil's March 9, 2012 motion to compel.[1] In that decision, the court ordered Mylan to produce, among other things: "laboratory notebooks, agenda and minutes of monthly R&D meetings, regulatory submissions and communications with FDA including ANDA filing and pre-ANDA communications with the FDA, and batch production records for the drug products at issue in this case" as well as "documents that relate to Dr. Govil's participation in the research and development of the 150 trade secrets to the extent that his participation involved the results of best candidate drugs for transdermal delivery, agenda and minutes of monthly R&D meetings, and research and development techniques." Decision on Zydus and Dr. Govil's Mot. to Compel at 7 (filed Mar. 21, 2013). At the time the court ruled on defendants' motion to compel, the court understood that Mylan was claiming that about 150 of its trade secrets were misappropriated. In its motion to reconsider, Mylan says that it served a "Second Amended Trade Secret Identification" on January 31, 2013, in which Mylan reduced its list of trade secrets to only nine secrets pertaining to two drug products: clonidine and estradiol (once a week).

The Second Amended Trade Secret Identification is attached to Zydus and Dr. Govil's opposition as Exhibit X to attorney Brian Beck's affidavit, and is sealed pursuant to the court's May 15, 2013 entry. The Second Amended Trade Secret Identification states that it is "distinct from, and does not list, products that are the subject of the causes of action relating to Defendant Govil's non-competition obligation, including but not limited to Fentanyl."[2] The court has

---

[1] Defendants' March 9, 2012 motion to compel was argued on June 27, 2012. There was some delay in deciding the motion because the court was for a time under the impression that the parties had resolved their discovery disputes.

[2] The court therefore understands that the shorter list of items in the Second Amended Trade Secret Identification applies primarily to Mylan's Count Four (misappropriation of trade secrets), and the longer list of about 150 items

reviewed the Second Amended Trade Secret Identification and compared it to Mylan's identification of trade secrets in Exhibit C to Koray J. Bulut's May 20, 2011 affidavit, as well as Mylan's supplemental identification dated November 28, 2011.[3] Without describing the highly confidential specifics in the Second Amended Trade Secret Identification, the court believes that it is fair to say that at least some of the alleged trade secrets in that document would fit in to one or more of the categories of alleged trade secrets in the May and November 2011 documents.

Mylan now requests that the court alter its March 20, 2013 order in two ways: (1) to limit the order to the nine trade secrets set forth in Mylan's Second Amended Trade Secret Identification, and (2) to limit the scope of the discovery order to documents created during Dr. Govil's employment with Mylan, which ended with his resignation on September 25, 2006. Zydus and Dr. Govil oppose Mylan's motion, arguing that: (1) the motion is procedurally improper; (2) documents concerning Mylan's estradiol (twice-weekly), lidocaine, nitroglycerin, and fentanyl products remain relevant; and (3) technical documents from after September 2006 remain relevant. In a reply filed on May 15, 2013, Mylan maintains that its motion is procedurally proper, and that the court's March 20, 2013 decision should be altered as Mylan requests.

## I. Procedure

Zydus and Dr. Govil contend that Mylan's motion is procedurally improper, arguing that nothing has changed since the motion was decided that would justify reconsideration. Opp'n at 12 (filed Apr. 24, 2013). Defendants maintain that Mylan made a decision to re-identify its trade secrets before the court decided the motion to compel, and that Mylan cannot now contend that there is "new evidence" justifying reconsideration because Mylan had more than six weeks (from January 31, 2013, the date it served the Second Amended Trade Secret Identification, to March 20, 2013, the date of the court's decision on the motion to compel) to notify the court that Mylan's list of claimed trade secrets had been reduced to nine. *Id*. at 1.[4] Mylan replies by noting that it did not amend its trade secret identification until well after briefing and argument on the motion to compel was completed, and therefore it was impossible for Mylan to have "discovered" its Second Amended Trade Secret Identification in time to argue the relevance of the streamlined identification in briefing or at oral argument on the motion to compel. Reply at 3 (filed May 15, 2013).

---

applies to the majority of the remaining counts, including Count One (breach of contract), Count Two (breach of the covenant of good faith and fair dealing), and Count Three (tortious interference with contract).

[3] The supplemental identification is attached to Zydus and Dr. Govil's opposition as Exhibit S to attorney Brian Beck's affidavit. That document is also designated "highly confidential," and the court will order it sealed.

[4] According to defendants, Mylan has no grounds to oppose producing the more expansive discovery because Mylan amended its trade secret identification without a showing of good cause. It is true that in in its October 26, 2011 Decision on Pending Motions, the court stated: "Trade secrets which are not identified in advance will not be the subject of a claim at trial. Reasonable amendment to the list of secrets will be allowed for good cause as discovery develops." Decision at 5. In that statement, the court was concerned with amendments to *add* to the list of trade secrets. In any case, the court concludes that there is good cause to pare down the list, both because Mylan is the master of its action against defendants, and because reducing the size of the list will help focus the misappropriation claim.

In Vermont, "[u]ntil final decree the court always retains jurisdiction to modify or rescind a prior interlocutory order." *Kelly v. Town of Barnard*, 155 Vt. 296, 307 (1990) (quoting *Lindsay v. Dayton-Hudson Corp.*, 592 F.2d 1118, 1121 (10th Cir. 1979)). Of course, "[m]otions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996) (citation omitted). Here, there is no newly discovered "evidence"— the new information now before the court is that Mylan's claim has changed insofar as Mylan is now claiming the misappropriation of only nine trade secrets. The court's statement in its March 2013 decision that Mylan is claiming the misappropriation of about 150 trade secrets is therefore erroneous. The court concludes that, if there is cause to limit the scope of discovery due to Mylan's streamlined trade-secrets-misappropriation claim, then the court has discretion to do so. See *Wesco, Inc. v. Sorrell*, 2004 VT 102, ¶ 18, 177 Vt. 287 (noting that "discovery rulings are inherently fluid because they fall within the trial court's discretion to revisit and alter as the litigation unfolds").

## II. Relevance of documents concerning Mylan's estradiol (twice-weekly), lidocaine, nitroglycerin, and fentanyl products

As stated above, Mylan has reduced its list of trade secrets to only nine secrets pertaining to two drug products: clonidine and estradiol (once a week). Mylan asserts that documents relating to trade secrets that are no longer the foundation for Mylan's trade-secrets-misappropriation claim are not relevant. Mot. at 5. Mylan therefore seeks to limit the court's production requirement to clonidine and estradiol (once a week). Zydus and Dr. Govil contend that documents concerning four of Mylan's other products—estradiol (twice-weekly), lidocaine, nitroglycerin, and fentanyl—might no longer be relevant to any trade secret misappropriation claim, but that those documents are relevant for other reasons. Specifically, defendants maintain that the documents are relevant to: (1) Mylan's credibility and Zydus's unfair competition counterclaim; (2) enforceability of a Trade Secrets and Invention Agreement that Dr. Govil signed in 1992 when he commenced his employment with Bertek, Inc.; and (3) damages and remedies.

### A. Whether documents concerning Mylan's other products are relevant to Mylan's credibility and to Zydus's unfair competition counterclaim

Zydus and Dr. Govil contend that they are entitled to documents concerning Mylan's other products in order to test whether Mylan ever had a good faith basis for asserting the 150 trade secrets that it did prior to January 2013. Defendants expect the documents to show that Mylan never recognized the 150 categories of information as trade secrets, and that such a showing would: (1) undermine Mylan's credibility; (2) support Zydus's unfair competition counterclaim; and (3) support sanctions against Mylan.

The court does not find defendants' argument in favor of relevancy as a means to undermine Mylan's credibility to be persuasive. It is true that, in a June 16, 2010 Ruling on Pending Motions, this court stated: "Should Mylan at trial change its claims as to what constitute its trade secrets, by adopting claims that its trade secrets look more like Defendants' than those previously asserted, that will be relevant to the credibility of its claims." Plainly Mylan has

3

changed what it claims to be its trade secrets, but Zydus and Dr. Govil have not shown that the nine secrets that Mylan is presently asserting look more like defendants' secrets than the 150 secrets that Mylan previously asserted.

Some context is necessary to understand the parties' arguments about the relevancy of documents concerning Mylan's other products to Zydus's unfair competition counterclaim. In Count Three of their counterclaims, Zydus and Dr. Govil allege that Mylan engaged in unfair competition because it initiated and maintained this action without probable cause, with no good-faith basis, with knowledge that the allegations and claims are without foundation, and with the knowledge and intent to burden and disrupt Zydus's business. Countercl. ¶ 141 (filed Jan. 10, 2011). Mylan sought dismissal of Count Three in a motion filed February 3, 2011, arguing that filing a lawsuit was an insufficient basis for a common-law unfair competition claim, and that the claim is barred by the *Noerr-Pennington* doctrine. The court denied Mylan's motion to dismiss, reasoning that Zydus and Dr. Govil had stated a claim because instituting groundless litigation against a competitor can be unfair competition. Ruling on Mot. to Dismiss Countercls. at 7 (filed May 17, 2011). After discussing the *Noerr-Pennington* doctrine,[5] the court concluded that the allegations in the counterclaim would be adequate to survive dismissal, since, if proven, those facts would show that Mylan was not entitled to *Noerr-Pennington* immunity under the sham litigation exception. *Id*. at 10. The court also rejected Mylan's contention that its prior success on a summary judgment motion filed by Zydus and Dr. Govil proved that Mylan's claims were not baseless, reasoning that surviving summary judgment does not establish conclusively that a suit is not a sham. *Id*. at 12.

Zydus and Dr. Govil argue that, if the documents concerning Mylan's other products show that Mylan never recognized the 150 categories of information as trade secrets, then that would be direct evidence that Mylan filed and maintained an objectively and subjectively baseless lawsuit. Mylan replies that discovery into any of the alleged trade secrets other than the nine that Mylan has now identified cannot be relevant to defendants' unfair competition claim because the "sham" exception to the *Noerr-Pennington* doctrine requires that defendants prove that Mylan's entire complaint is a sham—an impossibility because even if some of the now-abandoned secrets were not trade secrets, the remaining nine secrets would still be in play with respect to the misappropriation claim. Moreover, Mylan says several of its other claims have already survived a motion for summary judgment by defendants.

Assuming, without deciding, that a single baseless claim in a complaint could serve as grounds for a sham litigation claim, the court concludes that the discovery defendants seek would not help them prove that Mylan's misappropriation claim was a sham. The success of Mylan's misappropriation claim does not depend upon how many alleged secrets might have been misappropriated. Here, as stated above, at least some of the alleged trade secrets in Mylan's Second Amended Trade Secret Identification were alleged (albeit at a greater level of generality) in Mylan's earlier identifications. Even if many of the secrets that Mylan has since

---

[5] Named after *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965), the doctrine—as expanded by *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972)—"provides that the First Amendment right to petition the government protects litigants from liability for filing lawsuits, unless the lawsuits are found by a court to be 'shams.'" Ruling on Mot. to Dismiss Countercls. at at 8.

4

dropped from its claim were proven not to be trade secrets, that would not render Mylan's entire misappropriation claim baseless because there are some alleged trade secrets that have been a part of the claim since early in this case.

The court also concludes that discovery into the other products and the now-abandoned alleged secrets would not be relevant to any sanctions claim against Mylan. It is true that the court in *Compuware Corp. v. Health Care Service Corp.* sanctioned the plaintiff for failing to specifically identify its allegedly misappropriated trade secrets until less than two weeks before the close of discovery. No. 01 C 0873, 2002 WL 485710, at *8 (N.D. Ill. Apr. 1, 2002). However, that determination did not depend on the strength or weakness of any purported trade secrets that the plaintiff ultimately abandoned.

### B. Whether documents concerning Mylan's other products are relevant to the enforceability of the 1992 Trade Secrets and Invention Agreement

Some additional background is necessary to understand this aspect of defendants' relevancy argument. According to the allegations in Mylan's first amended complaint, Mylan Technologies, Inc. was formerly known as Bertek, Inc. and is a wholly-owned subsidiary of Mylan, Inc. First Am. Compl. ¶ 2 (filed Nov. 30, 2009). Mylan alleges that "[a]t the commencement of his employment with Bertek in 1992, Govil signed a Trade Secrets and Invention Agreement (the 'Trade Secrets Agreement')" and that "Govil's obligations under the Trade Secrets Agreement were transferred to [Mylan Technologies, Inc.] by virtue of the acquisition of Bertek in 1993." *Id*. ¶ 20.

The Trade Secrets and Invention Agreement is attached as Exhibit A to the first amended complaint, and includes the following language:

> The Employee shall not for a period of five (5) years after the termination of his employment with the Company, regardless of time, manner, or cause of such termination, directly or indirectly own, manage, control, be employed by, participate in or be or become associated in any way with any business or branch thereof engaged in the sale, production, manufacture, use, promotion, or development of any product or process . . . the same as or similar to any other products or processes of the Company which now or may during the term of the Employee's employment by the Company constitute trade secrets or confidential information of the Company.

In Count One of its complaint, Mylan alleges that Dr. Govil breached the Trade Secrets Agreement by becoming associated with Zydus, by failing to return records upon his resignation, and by using and divulging Mylan's confidential information and trade secrets. *Id*. ¶ 52. As noted above, the Second Amended Trade Secret Identification states that it is "distinct from, and does not list, products that are the subject of the causes of action relating to Defendant Govil's non-competition obligation, including but not limited to Fentanyl." Thus, although Mylan no longer claims that all 150 items on its earlier disclosures are trade secrets, it does maintain that those items are all at least confidential.

5

Zydus and Dr. Govil note that a restrictive covenant against competitive employment is not enforceable if it is "unnecessary for protection of the employer." *Vt. Elec. Supply Co. v. Andrus*, 132 Vt. 195, 198 (1974). They intend to argue that the Trade Secrets Agreement is unenforceable because it was unnecessary for Mylan's protection. To prove that the Trade Secrets Agreement was unnecessary for Mylan's protection, defendants seek to discover and present evidence that Mylan's products do not in fact embody trade secrets or otherwise confidential information. Mylan replies that the technical specifics of products that are not part of Mylan's misappropriation claim are irrelevant because (1) the non-competition provision does not require a showing of actual use, and (2) the production of technical documents will not speak to whether or not the information qualifies as "confidential."

Trade secrets and confidential information are legitimate interests of an employer and may be protected through a noncompetition agreement. See *Sys. & Software, Inc. v. Barnes*, 2006 VT 95, ¶ 5, 178 Vt. 389 (noncompetition agreements may be enforced to protect trade secrets and confidential customer information, among other things). As the 11th Circuit has explained:

> [A]n item may be considered confidential in the context of a business relationship without rising to the level of a trade secret. A confidential relationship is distinguished by the expectations of the parties involved, . . . while a trade secret is identified through rigorous examination of the information sought to be protected.

*Roboserve, Ltd. v. Tom's Foods, Inc.*, 940 F.2d 1141, 1456 (11th Cir. 1991). Here, the 1992 Trade Secrets and Invention Agreement sought to protect both "trade secrets" and "confidential information." Even if none of the 150 items Mylan originally put forth constitute trade secrets, it would still have a legitimate interest in protecting those items if they constitute confidential information. "Rigorous examination" of the technical information that defendants seek from Mylan is not necessary to make that determination.

### C. Whether documents concerning Mylan's other products are relevant to damages and remedies

Finally, defendants contend that Mylan's decision to seek contract damages for all six drug products puts at issue documents regarding those drugs—particularly FDA correspondence. Defendants say that the technical documents "will indicate the extent to which lost profits are attributable to Dr. Govil's use of confidential Mylan information, which is protectable, and to which lost profits are attributable merely to Dr. Govil's ordinary competition, which is not protectable." Opp'n at 22. Defendants also say that regulatory submissions and FDA correspondence regarding products that are not on the market are highly probative of whether and when these products will even make it onto the market: "If Mylan makes no profit off of products because they are never approved by the FDA, it obviously cannot claim any damages for them from a breach of a noncompete agreement." *Id*.

Mylan maintains that it would be Dr. Govil's contributions to the development of Zydus's products—not Mylan's—that would reveal the extent of his contributions. As for filings

6

and communications with the FDA, Mylan says that it can provide information as to the status of its "unlaunched" products, and thus it is unnecessary to produce ANDA filings and other highly confidential material.

Defendants are correct insofar as they assert that Mylan cannot recover as damages any lost profits attributable to the fact that Dr. Govil has been applying his general skills and knowledge to benefit one of Mylan's competitors. See *Reed, Roberts Assocs., Inc. v. Strauman*, 353 N.E.2d 590, 593 (N.Y. 1976) ("[N]o restrictions should fetter an employee's right to apply to his own best advantage the skills and knowledge acquired by the overall experience of his previous employment."). Thus it seems natural that defendants might seek to prove that Dr. Govil's contributions to Zydus's development of the drug products at issue were limited to the use of his acquired general expertise and knowledge of management of a transdermal drug company. However, defendants have not explained—nor is it obvious to the court—why such proof might require reference to the technical details of the four products that Mylan has dropped from its misappropriation claim. As for the FDA correspondence that defendants seek, it appears to be unnecessary in light of Mylan's willingness to supply information as to whether and when its "unlaunched" products might make it to the market.

## III. Relevance of Mylan's documents postdating Dr. Govil's resignation from Mylan in September 2006

Mylan's position is that documents and materials postdating Dr. Govil's departure from Mylan in September 2006 are not relevant to Mylan's claims. As to its misappropriation claim, Mylan observes that Dr. Govil could not have misappropriated information that postdates his departure. Mylan also asserts that the documents are not relevant to its efforts to protect the secrecy of its confidential information and trade secrets. Zydus and Dr. Govil concede that documents postdating Dr. Govil's departure from Mylan are not necessary to define Mylan's allegedly misappropriated trade secrets, but that such documents remain relevant to the value of the alleged trade secrets, and also to damages and remedies.

### A. Whether Mylan's technical documents postdating Dr. Govil's departure are relevant to the value of the alleged trade secrets

Defendants point to the following passage from the Restatement to support the proposition that the documents are relevant to the value of Mylan's alleged trade secrets:

> The value of information claimed as a trade secret may be established by direct or circumstantial evidence. Direct evidence relating to the content of the secret and its impact on business operations is clearly relevant. . . .

> The plaintiff's use of the trade secret in the operation of its business is itself some evidence of the information's value. Identifiable benefits realized by the trade secret owner through use of the information are also evidence of value. . . .

Restatement (Third) of Unfair Competition § 39 cmt. e. Defendants suspect—and seek to discover and prove—that Mylan has changed its formulation for clonidine and estradiol (once a

7

week), or has found acceptable alternatives to its alleged trade secrets, and that Mylan does not use its alleged trade secrets in a marketed product. Defendants say that such proof would be highly probative of the value of the alleged trade secrets, and that the most useful documents to determine whether Mylan still uses its alleged trade secrets are the post-2006 documents.

Mylan asserts that the documents have no bearing on whether the alleged trade secrets are valuable, arguing that whether the trade secrets at issue have been continuously used by Mylan since Dr. Govil's departure is irrelevant to their status as trade secrets. In support, Mylan also cites the Restatement (among other things), which states that its definition of a "trade secret" "contains no requirement that the information afford a continuous or long-term advantage." *Id.* § 39 cmt. d. Mylan also argues that, even if it no longer uses the trade secrets it is alleging, those secrets are still valuable as "negative" information insofar as they might prove that a certain process will *not* work.

Vermont has adopted the Uniform Trade Secrets Act, and therefore Vermont's definition of a "trade secret"[6] is broader than the common law definition:

> The definition of "trade secret" contains a reasonable departure from the Restatement of Torts (First) definition which required that a trade secret be "continuously used in one's business." The broader definition in the proposed Act extends protection to a plaintiff who has not yet had an opportunity or acquired the means to put a trade secret to use. The definition includes information that has commercial value from a negative viewpoint, for example the results of lengthy and expensive research which proves that a certain process will *not* work could be of great value to a competitor.

Comment, Unif. Trade Secrets Act § 1. It is therefore true that, in order for Mylan to prove that its information is a trade secret, Mylan does not need to prove that it has continuously used that information, or even that it has used the information at all in its operations. See *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 727 (7th Cir. 2003) ("It is irrelevant under Illinois law that PlayWood did not actually use the concept in its business." (citing *Syntex Opthalmics, Inc. v. Tsuetaki*, 701 F.2d 677, 683 (7th Cir. 1983))). Of course, if Mylan *is* using the alleged trade secrets in the operation of its business, the Restatement makes clear that that would be "some evidence" of the information's value. In other words, Mylan does not need to prove that it uses or ever used the information, but such proof might weigh in favor of finding that the information has value.

---

[6] Section 4601(3) of Title 9 defines a "trade secret" as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Is it relevant that Mylan might *not* currently be using that information, or that Mylan has never used it?  In other words, would that proof be "some evidence" of the information's lack of value?  Or is such proof irrelevant in all respects—not just irrelevant insofar as Mylan's burden to prove that its information is a trade secret?

The court concludes that it is irrelevant whether Mylan still uses its alleged trade secrets. It is true that "obsolete information cannot form the basis for a trade secret claim because the information has no economic value." *Fox Sports Net N., L.L.C. v. Minn. Twins P'ship*, 319 F.3d 329, 336 (8th Cir. 2003).  However, proof that Mylan is no longer using its alleged trade secrets does not tend to prove that the secrets are valueless.  Even if Mylan has recently made advances that render its alleged trade secrets obsolete *as to Mylan*, Mylan's earlier generations of technology can still have independent economic value if they are not generally known to or readily ascertainable by proper means by other persons who can obtain economic value from that information.  See *Dow Corning Corp. v. Jie Xiao*, 283 F.R.D. 353, 361 (E.D. Mich. 2012) ("The later generations of fluid-bed technology do not determine whether the first generation technology has 'no economic value.'").

## B.  Whether Mylan's documents post-dating Dr. Govil's departure are relevant to damages and remedies

Zydus and Dr. Govil assert that the post-2006 documents are relevant to: (1) damages on Mylan's contract claims; (2) damages on Mylan's trade secrets misappropriation claim; and (3) Mylan's demand for injunctive relief.  Mylan's reply addresses only the first alleged category of relevance.

The court begins with the relevance of the post-2006 documents to Mylan's demand for injunctive relief.  Defendants say that there can only be irreparable harm from the risk of exposure of a trade secret if Mylan still gains value from the trade secret.  According to defendants, "[i]f Mylan can only prove the past use of a now defunct trade secret, it would only be entitled to monetary damages for that past use."  Opp'n at 28.

Vermont law explicitly contemplates injunctive relief for the actual or threatened misappropriation of trade secrets.  See 9 V.S.A. § 4602(a) ("Actual or threatened misappropriation may be enjoined.").  Thus, one of the elements of relief that Mylan seeks is an order "enjoining Defendants and all others acting in privity or in concert with them, from directly or indirectly developing or selling any product that incorporates Plaintiffs' trade secrets."  First Am. Compl. at 20.  As mentioned above, defendants seek Mylan's current technical documents to attempt to prove that Mylan is no longer using any of its alleged trade secrets, on the theory that if Mylan is not currently gaining any value from any of those alleged secrets, then Mylan cannot be irreparably harmed from their exposure.  The court rejects this argument.  As one authority explains:

> The issuance of a permanent injunction does not require proof of irreparable harm or the absence of inadequate remedy at law.  The enactment of the statute granting the court power to issue an injunction in a trade secret case as part of a final

9

judgment by implication assumes that no such showing is needed or else the statutory provision would not have been enacted.

1 Melvin F. Jager, Trade Secrets Law § 7:12 (WL updated Apr. 2013); see also *Union Nat'l Life Ins. Co. v. Tillman*, 143 F. Supp. 2d 638, 641–42 (N.D. Miss. 2000) ("[T]o be awarded an injunction under [the Mississippi Uniform Trade Secrets Act], [plaintiff] need not demonstrate irreparable injury; a violation of the Act itself constitutes irreparable injury."); *Boeing Co. v. Sierracin Corp.*, 738 P.2d 665, 681 (Wash. 1987) (rejecting argument that a finding of irreparable harm must be entered in order to support injunction against trade secret misappropriation, and noting that "[t]o allow Sierracin in this case to continue to manufacture cockpit windows after deciding that it had misappropriated the information from Boeing would permit Sierracin to profit from its own wrongful conduct").

The court next turns to whether Mylan's post-2006 documents are relevant to Mylan's damages claim for defendants' alleged misappropriation. Defendants say that, pursuant to 9 V.S.A. § 4603(a),[7] damages for such a claim can be calculated based on defendants' alleged unjust enrichment, Mylan's lost profits, or a reasonable royalty.[8] For all three types of damages, defendants say that Mylan's post-2006 technical documents are probative of whether the alleged trade secrets are incidental to the product. As to unjust enrichment, defendants say:

> Evidence about whether alternatives exist to the use of the trade secrets, or how important the alleged trade secrets are to their products, is relevant to what fraction of Zydus Noveltech's (currently nonexistent) profits can be attributed to trade secret misappropriation. Mylan cannot claim that all of Zydus Noveltech's eventual profits are a result of trade secret misappropriation if the misappropriated trade secrets provided little assistance to Zydus Noveltech's development.

Opp'n at 27. Defendants also argue that "[t]he same evidence is relevant to what fraction of any lost profits Mylan alleges it has suffered or will suffer can be attributed to trade secret misappropriation." *Id*. Finally, they say that the information "is certainly relevant to what royalty Mylan can obtain for any alleged trade secret misappropriation." *Id*.

---

[7] Section 4603 provides as follows:

> (a) Except to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant is entitled to recover damages for misappropriation. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

> (b) If malicious misappropriation exists, the court may award punitive damages.

[8] See generally Annotation, *Proper Measure and Elements of Damages for Misappropriation of Trade Secret*, 11 A.L.R. 4th 12 (1982).

The court understands defendants' argument to be that they need discovery into Mylan's current trade secrets in order to show that fewer than all of Mylan's claimed damages were caused by any misappropriation. The court also understands that it is possible that, since September 2006, Mylan has found new ways to manufacture its products that make some or all of the nine alleged trade secrets in the Second Amended Trade Secret Identification less important to Mylan's operations. However, the court fails to see how proof that Mylan has found alternatives to the nine trade secrets might shed light on what portion of Zydus's gains or Mylan's losses are attributable to the alleged misappropriation of those secrets. How much assistance the allegedly misappropriated trade secrets provided to *Zydus's* development efforts would seem to be a separate issue than the question of where *Mylan's* development has gone since 2006. The same conclusion applies to defendants' argument about the relevance of the post-2006 documents to Mylan's contract claims.

## ORDER

Mylan's supplemental identification—attached to Zydus and Dr. Govil's opposition (filed Apr. 24, 2013) as Exhibit S to attorney Brian Beck's affidavit—shall be sealed.

Mylan's motion for reconsideration (filed April 9, 2013) is granted. The court's March 20, 2013 order is modified as follows:

Mylan shall produce laboratory notebooks, agenda and minutes of monthly R&D meetings, regulatory submissions and communications with FDA including ANDA filing and pre-ANDA communications with the FDA, and batch production records for clonidine and estradiol (once a week). Mylan shall not be required to produce any such documents created after September 25, 2006.

Mylan shall produce documents that relate to Dr. Govil's participation in the research and development of the nine trade secrets at issue to the extent that his participation involved the results of best candidate drugs for transdermal delivery, agenda and minutes of monthly R&D meetings, and research and development techniques.

Mylan shall produce the documents described above within 30 days of this order.

Dated at Burlington this ___ day of June 2013.

_____
Geoffrey W. Crawford
Superior Court Judge

11