**EXECUTIVE CENTER III, LLC, Plaintiff,**

v.

**Andrew MEIERAN and Andrew Meieran Family Trust, Defendants.**

**Case No. 10–CV–263–JPS.**

United States District Court, E.D. Wisconsin.

Oct. 4, 2011.

Order Denying Reconsideration Jan. 23, 2012.

Jeffrey D. Nordholm, Thomas L. Miller, Storm Balgeman Miller & Klippel SC, Wauwatosa, WI, for Plaintiff.

Michael P. Dunn, Kerkman & Dunn Milwaukee, WI, for Defendants.

## ORDER

J.P. STADTMUELLER, District Judge.

In March of 2010, the plaintiff filed a complaint against the defendants alleging that they had received fraudulent transfers from BRIC Executive, LLC ("BRIC"). (Docket # 1). BRIC, a real estate holding company, transferred $400,000 to the defendants, former partial owners of BRIC, allegedly in satisfaction of a debt. (Def.'s Reply, 2). Unfortunately, this transfer left BRIC unable to pay amounts they owed to plaintiff under a real estate sale contract. (Compl. ¶¶ 14–37).

Now, the plaintiff alleges that BRIC's transfer to the defendants was improper, as it made BRIC insolvent and unable to pay its debts to plaintiff. (Compl., ¶¶ 14–37). Thus, the plaintiff seeks to have the defendants held liable for BRIC's debts to the plaintiff. (Id.)

Discovery has now taken place, and the parties have fully briefed the issues raised in the defendants' May 10, 2011 Motion for Summary Judgment. (Docket # 33).

With the benefit of the parties' submissions, together with the analysis that follows, the motion before the Court will be granted in part and denied in part.

# 1. FACTUAL BACKGROUND

## 1.1 General Background

### 1.1.1 Defendants' Association with BRIC

On November 1, 2007, the defendants bought a 12.5% interest in BRIC, and simultaneously entered into an agreement to liquidate that interest by March 1, 2008. (Pl.'s Resp., 2; Def.'s Reply, 2). There were two parts to the November 1, 2007 agreement between BRIC and the defendants. (Pl.'s Resp., 2; Def.'s Reply, 2). The first part, the Assignment of Membership Interest, gave defendants a 12.5% interest in BRIC in exchange for $250,000. (Pl.'s Resp., 2; Def.'s Reply, 2). BRIC and defendants contemporaneously agreed to the second part, called the Amendment. (Compl., ¶ 6). The Amendment provided the following:

(1) any of BRIC's net income would be applied to repaying the defendants' $250,000 investment until the defendants' interest was liquidated;

(2) the defendants' were to receive a 12% per-annum preferred return on their investment;

(3) by March 1, 2008, BRIC would pay a liquidating distribution to the defendants in redemption of the 12.5% interest; and

(4) if BRIC did not meet the March 1, 2008 deadline, it would be required to pay additional penalties to the defendants.

(Pl.'s Resp., 2–3; Def.'s Reply, 2).

In summary, on November 1, 2007, BRIC contractually agreed to redeem defendants' 12.5% interest by March 1, 2008.

### 1.1.2 Plaintiff's Agreement with BRIC

Approximately a year-and-a-half after BRIC agreed to the Assignment and Amendment with the defendants, the plaintiff began negotiating with BRIC to purchase an office building in Brookfield, Wisconsin. Plaintiff alleges that on June 5, 2008, BRIC agreed to sell the building—its primary asset—to the plaintiff. (Compl., ¶ 5).

Plaintiff also alleges that, under the terms of the sale agreement, BRIC agreed to a three-year lease of office space from the plaintiff. (Compl., ¶ 8). The lease term was expected to begin on or about the final date of sale, September 5, 2008, and bring approximately $167,000 to the plaintiff. (Compl., ¶ 11).

On September 5, 2008, the sale closed. plaintiff paid approximately $1.3 million to purchase the building from BRIC. (Compl., ¶ 11).

### 1.1.3 BRIC's Insolvency and Transfer of Assets to Defendants

Using the $1.3 million it received, BRIC paid off several debts, leaving itself unable to pay the rent due to plaintiff under the sale contract.

Most importantly, BRIC paid $400,000 to the defendants on the date the sale closed. The defendants allege that BRIC paid the $400,000 in satisfaction of amounts owed to the defendants under the November 1, 2007 Assignment and Amendment. (Def.'s Br. in Supp., 3). Because BRIC had not paid the $250,000 due on March 1, 2008, penalties began to apply. (Pl.'s Resp., 3; Def.'s Reply, 3). This resulted in BRIC owing approximately $435,000 to the defendants as of August 31, 2008. (Pl.'s Resp., 3; Def.'s Reply, 3). To deal with this debt, on August, 28, 2008, BRIC agreed to pay the defendants $400,000 at the closing of the sale. (Compl. ¶ 7).

Thus, on September 5, 2008, upon the sale closing, BRIC paid $400,000 to the defendants. (Pl.'s Resp., 3; Def.'s Reply, 3).

BRIC also owed substantial sums on other debts, ultimately making it unable to afford to pay the amounts owed to plaintiff

under the lease-back term of the sale agreement. (Compl., ¶ 11). After the payment to the defendants, BRIC had only $697,358 remaining from the sale. (Compl. ¶ 11). That money constituted BRIC's only assets. (Compl. ¶ 11). Plaintiff alleges that BRIC paid $516,860 to release a second mortgage on the building and an additional $144,898 on other liabilities. (Compl., ¶ 11).

Having pledged its money elsewhere, BRIC never paid any of the amounts due to plaintiff under the sale agreement. (Compl., ¶ 12). BRIC defaulted on the sale agreement almost immediately, failing to pay even its first rent payment due October 1, 2008. (Compl., ¶ 13).

Plaintiff then sought and received a money judgment against BRIC from the Waukesha County, Wisconsin state court. (Compl., ¶ 13). Plaintiff's judgment against BRIC is for $152,139. (Compl., ¶ 13).

### 1.1.4 Plaintiff's Filing of This Suit

Being insolvent, BRIC never paid on the plaintiff's judgment. Thus, plaintiff followed the money and came upon the defendants, who had received $400,000 immediately after the close of the sale. (Pl.'s Resp., 3; Def.'s Reply, 3). The plaintiff was understandably concerned that the defendants—partial owners of BRIC—had been paid a substantial sum of money, while the plaintiff was left without.

Thus, on March 26, 2010, the plaintiff filed this suit, challenging the transfer from BRIC to the defendants as fraudulent, and seeking an award of damages against the defendants. The plaintiff alleges that, in accepting the $400,000 transfer, the defendants: (1) violated several portions of Wisconsin's Uniform Fraudulent Transfer Act, Wis. Stat. § 242.01, *et seq.*; (2) breached a fiduciary duty they owed to the plaintiff; and (3) benefitted from inequitable preference. (Compl. ¶¶ 14–37).

The case was filed in this judicial district on the basis of diversity jurisdiction. (Compl. ¶ 1 (citing 28 U.S.C. § 1332); Ans. ¶ 1). The plaintiff is a Wisconsin business with total diversity from the defendants, who are residents of California. (Compl. ¶ 1; Ans. ¶ 1). And, because the amount in controversy is approximately $150,000, plus interest costs—exceeding the $75,000 required by statute for diversity—the Court can hear this case. (Compl. ¶ 1 (citing 28 U.S.C. § 1332); Ans. ¶ 1).

### 1.2. Admissible Evidence for Summary Judgment

The parties in this action have reached an agreement on several material facts in the case. (*See* Def.'s Reply 1–3; Pl.'s Resp. 2–6). The defendants outlined these agreed upon in their Reply Brief, and the Court now recounts them. (*See* Def.'s Reply 1–3; Pl.'s Resp. 2–6).

The parties agree on a substantial number of the facts that underlie the transactions between BRIC and the defendants. Importantly, both parties agree on the facts relating to the creation and terms of the November 1, 2007 Agreement and Amendment. (Def.'s Reply 2; Pl.'s Resp. 2–3). They also agree that BRIC did not pay any money in satisfaction of the Amendment by March 1, 2008, and that no payments were made by BRIC to the defendants until September 5, 2008. (Def.'s Reply 2; Pl.'s Resp. 3). The parties have also agreed that the defendants reassigned the 12.5% membership interest to BRIC on September 5, 2008. (Pl.'s Resp. 4). Finally, in reference to the financial relationship between BRIC and the defendants, the parties have agreed that BRIC owed $435,000 to the defendants as of August 31, 2008, pursuant to the Amendment. (Def.'s Reply 3; Pl.'s Resp. 3).

As to the relationship and transactions between the plaintiff and BRIC, the par-

ties agree only that plaintiff is a creditor of BRIC. (Def.'s Reply 2; Pl.'s Resp. 2).

However, based upon the submitted affidavits, pleadings by the parties, and discovery responses, the Court is able to make additional findings of fact relating to BRIC's dealings with the plaintiff. The Court finds that BRIC agreed to a three-year lease from the plaintiff. (D. Heyes Aff. ¶ 6; P. Heyes Aff. ¶ 7; Ex. C, § 9.01(c)).

The Court can also look to the submissions of the parties and determine that BRIC became insolvent shortly after the September 5, 2008 sale. It sold its only asset, the office building, on September 5, 2008; after that point, BRIC immediately transferred $400,000 to defendants, leaving it with debts that exceeded its assets. (D. Heyes Aff. ¶ 8; P. Heyes Aff. ¶¶ 7–9). Thus, as of September 5, 2008, BRIC was insolvent. (P. Heyes Aff. ¶¶ 7–8).

Finally, from the submissions of the parties, the Court also determines that the defendants' 12.5% interest was not worth $250,000 or $400,000 as of the September 5, 2008 transfer. (Nordholm Aff. ¶¶ 3–5; Admitted Fact # 28–29)

## 2. DISCUSSION

### 2.1 Summary Judgment Standard

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Thomas v. H & R Block Eastern Enters.*, 630 F.3d 659, 663 (7th Cir.2011); Fed.R.Civ.P. 56(a).

A "genuine issue of material fact" exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To be "genuine," the issue must create more than "some metaphysical doubt as to the mate-

rial facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Further, it is only when the facts are "material" and "might affect the outcome of the suit under the governing law," that summary judgment is inappropriate. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

In deciding a summary judgment motion, the Court must construe all facts and draw all reasonable inferences in favor of the nonmoving party. *Thomas*, 630 F.3d at 663; *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 545 (7th Cir.2008). The nonmoving party cannot simply rely on mere allegations or denials of the pleadings, though. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must present genuine, admissible evidence to show that a factual issue exists that would preclude summary judgment on an issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### 2.2 Plaintiff's Claims

The plaintiff raises five claims, alleging that the defendants: (1) received a fraudulent transfer in violation of Wis. Stat. § 242.04(1)(b); (2) received a fraudulent transfer in violation of Wis. Stat. § 242.05(2); (3) received a fraudulent transfer in violation of Wis. Stat. 242.05(1); (4) breached a fiduciary duty it owed to the plaintiff; and (5) received the transfer as a result of inequitable preference due to its position as a partial owner of BRIC. (Compl. ¶¶ 14–37).

As discussed below, only the plaintiff's fourth claim presents a genuine issue of material fact that should be decided at trial. As such, the Court must grant summary judgment on the remaining claims.

### 2.2.1 Fraudulent Transfer in Violation of Wis. Stat. § 242.04(1)(b)

According to Wis. Stat. § 242.04(1)(b), a transfer should be considered fraudulent if the following factors exist:

(1) there was a transfer made by the debtor to another party;

(2) the debtor did not receive a reasonably equivalent value in exchange for the transfer; and

(3) the debtor was insolvent at the time of the transfer (or was about to engage in business for which its remaining assets were unreasonably small).

In this case, both the first and the third factors are satisfied. The debtor (BRIC) did make a transfer to the Defendant. (D. Heyes Aff. ¶¶ 7–8; P. Heyes Aff. ¶ 7). BRIC was also insolvent under the terms of Wis. Stat. § 242.04(1)(b)(2), because the transaction resulted in it being unable to pay its debts. (D. Heyes Aff. ¶ 7; P. Heyes Aff. ¶¶ 7–9).

■ Having shown the first and third factors, plaintiff can escape summary judgment on its claim if a genuine issue of material fact exists as to the second factor: whether BRIC received reasonably equivalent value in exchange for its transfer to the defendants.

The term "reasonably equivalent value" is not defined in Wisconsin's Uniform Fraudulent Transfers Act (WUFTA), under which the plaintiff's statutory claims arise. See Wis. Stat. § 242.01, et seq. However, looking to other definitions found in the WUFTA statutes, as well as the plain language of the statute, the Court can determine the term's meaning. See, e.g., U.S. v. Riverside Bayview Homes, 474 U.S. 121, 139, n. 11, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985) (stating that, to formulate a construction for an otherwise undefined term, a court may look to other terms found elsewhere in an act; this rule of statutory construction is known as in pari materia ); Wisconsin v. Magnuson, 2000 WI 19, ¶ 26, 233 Wis.2d 40, 49, 606 N.W.2d 536, 540 (not limiting the definition of a term to its specific subsection, but instead looking to related statutes).

Looking to the term's plain meaning and other similar statutes, the Court determines that BRIC received "reasonably equivalent value" in exchange for the $400,000 it transferred to the defendants. WUFTA defines "value" as including the satisfaction of "antecedent debt." Wis. Stat. § 242.03. It also defines "debt" to mean "any liability on a claim"; it then goes further to define "claim" to mean "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Wis. Stat. §§ 242.01(5), (3).

Thus, extrapolating from those definitions, it is clear that BRIC received reasonably equivalent value so long as, in exchange for the $400,000 it transferred, the defendants forgave:

(1) a "claim," broadly-defined under Wis. Stat. § 242.01(3);

(2) that arose antecedent to the transfer; and

(3) that is "reasonably equivalent," to the value of the transfer.

All three of these conditions were satisfied here. First, in exchange for the $400,000 BRIC transferred to the defendants, the defendants forgave a "claim" they had against the defendants. While that claim was not reduced to a judgment at the time of the transfer, there is no dispute that BRIC owed over $400,000 to the defendants on August 31, 2008. (Pl.'s Resp. 3; Def.'s Reply 3). That $400,000 claim was fixed and matured as of March 1, 2008, simply due to the agreement that BRIC entered with the defendants under the Amendment. As such, the defendants forgave a "claim" against BRIC in exchange for the $400,000 transfer.

Second, the defendants' claim arose antecedent to the transfer. "Antecedent," by

its plain term, means "earlier." *Black's Law Dictionary* (9th ed. 2009). The defendants' claim against BRIC arose on March 1, 2008, when it matured according to the terms of the Amendment. Thus, the claim arose prior to any of BRIC's transactions with the plaintiff. Thus, the forgiven claim was antecedent.

Third, the value of the transfer was "reasonably equivalent" to the value of the forgiven claim. "Reasonably equivalent," by its plain terms, simply means approximately "equal in value." *Id.* In this case, the defendants' claim against BRIC was for $435,000; in exchange for forgiving those claims, defendants received $400,000 in cash. While a claim for $435,000 against a near-insolvent company may not have an exact cash value of $400,000, the comparability of value of the forgiven debt to the cash transferred persuades this Court that the two were reasonably equivalent.

It is also important to note that the plaintiff argues that the purpose behind BRIC's $400,000 payment to the defendants was made solely as a redemption of shares, and not in satisfaction of any debt that arose under the Amendment. (Pl.'s Resp., 3). The evidence establishes that this assertion is incorrect. While BRIC *did* redeem the defendants' shares, that redemption was part of the original agreement under the Amendment. (Pl.'s Resp. 2–3; Def.'s Reply 2). The simple fact that the Amendment called for a redemption of shares does not mean that the defendants' right to $400,000 is something other than a claim. The defendants still had a "claim," under the broad definition of that term that is found in WUFTA. Wis. Stat. § 242.01(3).

Thus, finding no genuine issues of material fact that relate to plaintiff's claim under Wis. Stat. § 242.04(1)(b) or—more specifically—to the issue of "reasonably equivalent value," the Court will grant the

defendants' Motion for Summary Judgment on the plaintiff's first claim.

### 2.2.2 Fraudulent Transfer in Violation of Wis. Stat. § 242.05(2)

Both parties have agreed that the plaintiff's second claim, arising under Wis. Stat. § 242.05(2), should be dismissed as it is time-barred. (Def.'s Br. in Supp. 4–5; Pl.'s Resp. 12).

The Court agrees, and thus will grant defendants' Motion for Summary Judgment on plaintiff's second claim.

### 2.2.3 Fraudulent Transfer in Violation of Wis. Stat. § 242.05(1)

According to Wis. Stat. § 242.05(1), a transfer should be considered fraudulent if the following conditions are met:

(1) there was a transfer made by a debtor to another party;

(2) the creditor's claim against the debtor arose before the transfer;

(3) the debtor made the transfer without receiving reasonably equivalent value in exchange for the transfer; and

(4) the debtor was insolvent at the time of the transfer.

Here, plaintiff raises no issues of material fact. It argues that its claims against BRIC arose before the transfer. (Pl.'s Resp. 10–11). Ultimately, the timing of the transfer is not a material fact, though, because the transfer does not satisfy the third factor to be considered fraudulent: BRIC did not make the transfer for less than reasonably equivalent value. *See* Section 2.2.1, *infra.*

Therefore, the Court will grant the defendants' Motion for Summary Judgment on the plaintiff's third claim.

### 2.2.4 Breach of Fiduciary Duty

In deciding whether to grant summary judgment on the plaintiff's fourth claim, the Court must answer two separate ques-

tions: first, whether common law duties apply to Wisconsin LLCs; and, second, if those common law duties do apply, whether any issues of material fact relating to the breach of those duties are in dispute.

The Court finds that common law duties do apply to Wisconsin LLCs and that issues of material facts remain that relate to the defendants' breach of those duties. Therefore, the Court must deny the defendants' Motion for Summary Judgment on the plaintiff's fourth claim.

### 2.2.4.1 Application of Common Law Fiduciary Duties to Wisconsin LLCs

The plaintiff argues that the defendants violated common law fiduciary duties when it accepted BRIC's payment of $400,000. (Compl. ¶¶ 27–33).

The defendants' first line of defense against this claim is to argue that common law fiduciary duties do not apply to LLCs in Wisconsin. (Def.'s Br. in Supp. 5–6; Def.'s Reply 4–5). defendants make a number of arguments on this point. First, citing *Gottsacker v. Monnier*, the defendants argue that the Wisconsin Supreme Court has held that common law fiduciary duties do not apply to Wisconsin LLCs because LLCs are purely statutory creatures that have their duties defined entirely by statute. (Def.'s Br. in Supp. 5–6 (citing *Gottsacker v. Monnier*, 2005 WI 69 ¶ 45, 281 Wis.2d 361, 385, 697 N.W.2d 436, 447); Def.'s Reply 4–5 (citing same)). Second, the defendants cite the statutes that relate to duties that LLCs owe to third parties. (Def.'s Br. in Supp. 6 (citing Wis. Stat. §§ 183.0304, 183.0502, 183.0608); Def.'s Reply 5 (citing Wis. Stat. § 183.0304)). The defendants point out that none of those LLC statutes expressly state that common law fiduciary duties will apply to LLCs, with the exception of Wis. Stat. § 183.0304's incorporation of veil-piercing principles into LLC duties. (Def.'s Br. in Supp. 6 (citing Wis. Stat.

§§ 183.0304, 183.0502, 183.0608); Def.'s Reply 5 (citing Wis. Stat. § 183.0304)).

■ While the defendants raise some good points, the Court must ultimately disagree with them, and find that common law fiduciary duties *do* apply to LLCs in Wisconsin.

To begin, the Court notes that there is no statutory or common law in Wisconsin that expressly incorporates common law fiduciary duties against LLCs. Contrary to the defendants' assertions, *Gottsacker* does not hold that LLCs are exempt from all common law fiduciary duties. 2005 WI 69 ¶ 37, 281 Wis.2d at 381, 697 N.W.2d at 446. Rather, that case dealt with a number of fact-specific issues relating to the operation of an LLC—none of which specifically apply to this case. *See Id.*, 2005 WI 69 ¶¶ 20–37, 281 Wis.2d at 373–381, 697 N.W.2d at 442–446.

In reaching its decision, the *Gottsacker* court discussed the recently-created LLC business form, making many comparisons between it and corporations and partnerships. *Id.*, 2005 WI 69, ¶¶ 14–19, 281 Wis.2d at 370–373, 697 N.W.2d at 440–442. But the *Gottsacker* court never expressly stated that common law fiduciary duties relating to partnership and corporations should apply to LLCs. *See Id.*

On the other hand, though, it also did not explicitly state that those duties would *not* apply to LLCs. *See Id.* Only Justice Roggensack, in her concurrence, makes any statement that could be construed to be so far-reaching. *See Id.*, 2005 WI 69 ¶ 45, 281 Wis.2d at 385, 697 N.W.2d at 447. She stated that "the rights and obligations of a limited liability company to its members, of the members to the limited liability company and to each other are set by [statute]. Common law concepts such as the fiduciary duty of a majority shareholder of a corporation to a minority shareholder are replaced by statutory obli-

gations." *Id.* (citing Wis. Stat. §§ 183.0402, 183.1302(3)).

For two reasons, this Court believes that Justice Roggensack's statement does not prevent application of all common law fiduciary duties to LLCs. First, as noted above, her statement was made as a part of a concurrence, and thus is not a part of the holding of the *Gottsacker* court. 2005 WI 69 ¶ 45, 281 Wis.2d at 385, 697 N.W.2d at 447. And, second, Justice Roggensack mentioned only common law duties regarding the relations between interior members (majority and minority shareholders)—she never definitively stated that common law fiduciary duties regarding third parties have been abrogated by statute. *Id.*

A further search of Wisconsin case law does not reveal any cases that have delved deeper into the common law fiduciary duties of LLCs.

Thus, the Court is unable to find that any common law expressly prevents application of common law fiduciary duties to LLCs.

Similarly, the Court finds that the existence of LLC statutes does not necessarily mean that common law fiduciary duties do not apply to LLCs. The defendants argue that, because LLCs are creatures of statute with certain duties defined by statute, common law fiduciary duties have been totally abrogated. (Def.'s Br. in Supp. 6 (citing Wis. Stat. §§ 183.0304, 183.0502, 183.0608); Def.'s Reply 5 (citing Wis. Stat. § 183.0304)).

The Court is not so convinced. As the *Gottsacker* court noted, LLCs share much in common with corporations. 2005 WI 69, ¶¶ 14–19, 281 Wis.2d at 370–373, 697 N.W.2d at 440–442. Like LLCs, corporations are creatures of statute. Wis. Stat. § 180.0101, *et seq.* Additionally, the statutes impose duties upon corporate officers and directors. Wis. Stat. §§ 180.0801, 180.0841. Nonetheless, corporations are

considered to have common law fiduciary duties. *See Beloit Liquidating Trust v. Grade,* 2004 WI 39 ¶ 37, 270 Wis.2d 356, 380, 677 N.W.2d 298, 310.

Thus, the Court is unable to conclude that common law fiduciary duties ought not apply to LLCs because of the mere existence of statutes relating to the creation and duties of LLCs.

In fact, there is growing consensus that common law fiduciary duties should apply to the operations of LLCs. *See, e.g., Credentials Plus, LLC v. Calderone,* 230 F.Supp.2d 890, 899 (N.D.Ind.2002) ("Indiana LLCs, being similar to Indiana partnerships and corporations impose a common law fiduciary duty on their officers and members in the absence of contrary provisions in LLC operating agreements."); *Purcell v. S. Hills Invs., LLC,* 847 N.E.2d 991, 997 (Ind.Ct.App.2006) ("In line with the district court's opinion in *Credentials Plus,* we now hold that common law fiduciary duties, similar to the ones imposed on partnerships and closely-held corporations, are applicable to Indiana LLCs."); *Patmon v. Hobbs,* 280 S.W.3d 589, 594 (Ky.Ct.App.2009) (stating "this Court finds that Kentucky limited liability companies, being similar to Kentucky partnerships and corporations, impose a common-law fiduciary duty on their officers and members in the absence of contrary provisions in the limited liability company operating agreement."); *Gottlieb v. Kest,* 141 Cal.App.4th 110, 152, 46 Cal. Rptr.3d 7 (Cal.App.2d Dist.2006); *People v. Pacific Landmark, LLC,* 129 Cal. App.4th 1203, 1211–1216, 29 Cal.Rptr.3d 193 (Cal.App.2d Dist.2005); *Maxemus Entertainment, LLC v. Josey,* 35 Conn. L.Rptr. 454, p. *3 & fn. 4, 2003 WL 22205931 (Super.Ct.2003) (applying Rest.2d Judgments, § 59(3)(a) to limited liability companies); *Bushi v. Sage Health Care, PLLC,* 146 Idaho 764, 203 P.3d 694,

699 (2009); Sandra K. Miller, *What Fiduciary Duties Should Apply to the LLC Manager After More Than a Decade of Experimentation?*, 32 Iowa J. Corp. L. 565, 611–612 (taking issue with Justice Roggensack's *Gottsacker* concurrence). *But see WAKA, LLC v. Humphrey*, 2007 WL 6013199, at *3, 2007 Va. Cir. LEXIS 96, at *9–*10 (May 2, 2007).

█ Logic dictates the same. Fiduciary duties exist to protect people who are affected by the actions of those who control businesses. *See Id.*, 2004 WI 39 ¶¶ 33–39, 270 Wis.2d at 378–380, 677 N.W.2d at 309–310. Therefore, it would not make any sense if the expectation for a business to act fairly were to be different simply due to the business owners' choice of form—an LLC, in this case. If that were so, every dishonest owner could simply elect to operate its business as an LLC and claim that no fiduciary duties applied to its actions.

For these reasons, the Court finds that common law fiduciary duties apply to LLCs.

### 2.2.4.2 Material Facts in Dispute Regarding Defendants' Fiduciary Duties

█ The defendants owed a common law fiduciary duty to the plaintiff if two conditions existed at the time of the transfer:

(1) the company in question was insolvent; and

(2) the company had ceased to act as a going concern.

*Beloit Liquidating Trust*, 2004 WI 39 ¶ 37, 270 Wis.2d at 380, 677 N.W.2d at 310.

As discussed above, the Court has already found that BRIC was insolvent at the time of the transfer—therefore, the first factor is satisfied. (D. Heyes Aff. ¶ 8; P. Heyes Aff. ¶¶ 7–9).

As to the second factor, even the defendants concede that there is an issue of fact raised by the affidavits. (Def.'s Reply 4;

Pl.'s Resp. 4 (citing D. Heyes Aff. 8; P. Heyes Aff. 9)). In their reply brief, the defendants explicitly state that "the affidavits submitted by [P]laintiff create an issue of fact concerning whether BRIC was a going concern as of September 5, 2008." (Def.'s Reply 4).

That issue is material, because it "might affect the outcome" of this suit. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Depending on the date at which BRIC ceased to act as a going concern, the plaintiff's fiduciary duty claim may fail. But, as the parties seem to agree, there is an issue of fact on this matter, over which a reasonable jury could return a verdict for the plaintiff. (*See* Def.'s Reply 4; Pl.'s Resp. 4 (citing D. Heyes Aff. 8; P. Heyes Aff. 9)).

Summary judgment is inappropriate on this claim, because genuine issues of material fact remain. Therefore, the Court must deny the defendants' Motion for Summary Judgment on the second claim.

### 2.2.5 Inequitable Preference

█ As the defendants point out and the plaintiff concedes, Wisconsin does not recognize inequitable preference claims. (Def.'s Br. in Supp. 7; Pl.'s Resp. 14–15). This Court will not be the first to apply an inequitable preference claim under Wisconsin law; therefore, the Court will grant defendants' Motion for Summary judgment in relation to this claim.

The plaintiff urges this court to follow the lead of another jurisdiction that recognizes an inequitable preference claim. (Pl.'s Resp. 14–15 (citing *Poe v. Emberton*, 438 So.2d 1082 (1983))).

The Court will not take such a step. To begin, there are no Wisconsin cases that discuss an inequitable preference claim with approval. Further, the plaintiff fails to cite adequate case law to persuade this Court that an inequitable preference claim is either widely accepted or a wise course

of action that this Court should take. (*See* Pl.'s Resp. 14–15). In the Court's own research, it has not found anything to the contrary. The Court has not identified a majority—or even a trend—of jurisdictions that recognize inequitable preference claims in similar cases. Thus, the Court is not under obligation to consider such a claim and finds no reason to do so.

Finally, the Court should note the reasons it found it appropriate to look to extraterritorial case law in recognizing a fiduciary duty claim, but declined to do so in relation to the inequitable preference claim. First, a genuine issue relating to the fiduciary duties of LLCs seems to exist in Wisconsin law, while there has been practically no discussion of an inequitable preference claim. The Wisconsin Supreme Court raised the fiduciary duty issue to an extent, in *Gottsacker,* but did little to clear up the issue. 2005 WI 69, ¶¶ 14–19, 37, 281 Wis.2d at 370–373, 381, 697 N.W.2d at 440–442, 446. On the other hand, Wisconsin courts have not raised the issue of inequitable preference in over 100 years. *See Ford v. Plankinton Bank,* 87 Wis. 363, 58 N.W. 766 (1894); *Powers v. C.H. Hamilton Paper Co.,* 60 Wis. 23, 18 N.W. 20 (1884); *Levy v. Martin,* 48 Wis. 198, 4 N.W. 35 (1880). Second, there is a broad body of case law and scholarly discussion on whether common law fiduciary duties should apply to LLCs. *See* Section 2.2.4.1, *infra.* On the other hand, there is little discussion of application of inequitable preference claims to facts such as those presented here.

For these reasons, the Court is confident that it should not be the first to apply an inequitable preference claim under Wisconsin law.

Therefore, the Court will grant defendants' Motion for Summary Judgment on the plaintiff's fifth claim.

### 3. CONCLUSION

For the foregoing reasons, the defendants' Motion for Summary Judgment is granted in part and denied in part.

Accordingly,

**IT IS ORDERED** that the defendants' Motion for Summary Judgment (Docket # 33) be and the same is hereby **GRANTED in part,** with respect to plaintiff's first, second, third, and fifth claims;

**IT IS FURTHER ORDERED** that the defendants' Motion for Summary Judgment (Docket # 33) be and the same is hereby **DENIED in part,** with respect to plaintiff's fourth claim.

### ORDER

The plaintiff, a creditor of BRIC Executive, LLC ("BRIC"), filed this suit against the defendants, former partial owners of BRIC, alleging that the defendants received fraudulent transfers from BRIC in violation of a number of sections of the Wisconsin Uniform Fraudulent Transfers Act ("WUFTA"). (*See* Docket # 1).

The defendants moved for summary judgment on those claims and, on October 4, 2011, this Court entered an order granting summary judgment on four of the plaintiff's five claims. (*See* Docket # 45). All of the dismissed claims were made under WUFTA. (*See, e.g.,* Docket # 1, # 45). The single claim that the Court left intact related to whether the defendants owed a fiduciary duty to the plaintiff. (*See, e.g.,* Docket # 1, # 45).

Following entry of that order, the plaintiff moved the Court to reconsider its summary judgment ruling on the plaintiff's first and third claims. (Docket # 48, # 50). The parties have now fully briefed the issue. (Docket # 50, # 51, # 52). For the following reasons, the Court will deny the plaintiff's motion for reconsideration.

## 1. Factual Background

The facts in this case are rather complicated, due to a number of simultaneous agreements that ultimately form the subject of this dispute. The facts are only complicated further by the plaintiff's motion for reconsideration, in which they argue that the Court should consider newly-presented evidence and related facts.

In an attempt to set forth the facts as clearly as possible, the Court will first address the agreements that existed between the entities in this case without addressing the parties' participation as members in each of the entities. After addressing the agreements, the Court will turn to the parties' membership in the multiple entities in this case.

### 1.1 Agreements Between Executive Center III, Meieran, and BRIC

On November 1, 2007, the defendants entered into a transaction ("the Agreement") in which they received a 12.5% interest in BRIC. (Pl.'s Br. in Supp. Mot. for Reconsid. 2). The Agreement called for the 12.5% interest to be repurchased by March 1, 2008, for $250,000, plus 12% interest and a number of penalty charges if the repurchase did not occur before the March 1, 2008 deadline. (Pl.'s Br. in Supp. Mot. for Reconsid. 2). When repurchase did not occur prior to March 1, 2008, the penalty provisions took effect, resulting in the defendants being owed a total of $400,000 under the Agreement. (*See* Pl.'s Br. in Supp. Mot. for Reconsid. 2).

Shortly thereafter, BRIC entered into real estate contracts with the plaintiff. (Pl.'s Br. in Supp. Mot. for Reconsid. 2). The first contract called for BRIC to sell its principle asset, an office building, to the plaintiff. (Pl.'s Br. in Supp. Mot. for Reconsid. 2). The second contract required that, following the sale, BRIC would lease an office suite in that building from the plaintiff, which would net the plaintiff approximately $150,000 in rent. (Pl.'s Br. in Supp. Mot. for Reconsid. 2).

However, prior to the finalization of those contracts, BRIC entered an agreement with the defendants to redeem the 12.5% interest in exchange for the $400,000 debt owed to the defendants under the Agreement. (Pl.'s Br. in Supp. Mot. for Reconsid. 2). Thus, after BRIC sold the office building to the plaintiff, BRIC used $400,000 of the sale proceeds to redeem the defendants' 12.5% interest. (Pl.'s Br. in Supp. Mot. for Reconsid. 2).

That $400,000 payment left BRIC without substantial assets, ultimately causing BRIC to default on its obligation to the plaintiff to rent office space. (Pl.'s Br. in Supp. Mot. for Reconsid. 2). On that basis, the plaintiff secured a $156,140.87 judgment against BRIC. (Pl.'s Br. in Supp. Mot. for Reconsid. 2).

However, the plaintiff also brought this suit against the defendants, arguing that the $400,000 payment from BRIC to the defendants was a fraudulent transfer in violation of a number of sections of WUFTA. (Pl.'s Br. in Supp. Mot. for Reconsid. 3).

The Court, in its October 4, 2011 summary judgment order, disagreed, finding that the $400,000 payment from BRIC to the defendants was in satisfaction of a claim that arose under the Agreement. (Order 9–11). Having found that the $400,000 payment was made in satisfaction of a $400,000 antecedent debt, and thus was of reasonably equivalent value to forgiveness of that debt, the Court found that the plaintiff's WUFTA claims failed. (Order 9–11).

### 1.2 Membership in BRIC

To be sure, the Court's finding of reasonably equivalent value—and thus lack of any WUFTA violation—rested upon the

assumption that the Agreement was valid. If the Agreement was invalid, then BRIC would not have owed the defendants $400,000. If that were the case, then BRIC's $400,000 transfer would have been made purely in exchange for the defendants' 12.5% membership interest—likely not reasonably equivalent to $400,000 in value and, thus, hypothetically constituting a violation of WUFTA that would entitle the plaintiff to judgment against the defendants for receipt of a fraudulent transfer.

As such, the plaintiff has requested that this Court reconsider its prior summary judgment order, arguing that newly presented evidence regarding membership shows that the Agreement was invalid.

The parties agree on a number of points in regard to membership. First, the parties agree that, prior to the Agreement, Paula Heyes held a membership interest in BRIC. (See Pl.'s Br. in Supp. Mot. for Reconsid. 3–4 (establishing that Paula Heyes entered into the Agreement to assign a membership interest in BRIC, thus implying that—at some point prior to entering that agreement—Paula Heyes held a membership interest)). In the proposed findings of fact presented to this Court at the summary judgment stage, the parties also agreed to the following pertinent facts:

1.  through the Agreement, Paula Heyes assigned her 12.5% membership interest in BRIC to the defendants in exchange for $250,000;

2.  through the Agreement, BRIC was required to pay the defendants a $250,000 liquidating distribution by March 1, 2008, along with 12% interest and penalties if the March 1, 2008 deadline was not complied with; and

3.  the parties did not comply with the March 1, 2008 deadline and, thus, penalties applied, causing a total sum of $435,000 to be owed to the defendants.

(See Pl.'s Br. in Supp. Mot. for Reconsid. at 3–4). Thus, according to these agreed facts, so long as Paula Heyes had the authority to enter into the Agreement with the defendants, then the Agreement was valid and BRIC owed a $435,000 antecedent debt to the defendants. And, flowing from that fact, so long as BRIC owed a $435,000 antecedent debt to the defendants, then the defendants' receipt of $400,000 in satisfaction of that debt was of reasonably equivalent value and, therefore, not the receipt of a fraudulent transfer under WUFTA.

However, this understanding rests on the assumption that Paula Heyes had the authority to enter into the Agreement.

The plaintiff has now brought this motion for reconsideration arguing that, in fact, Paula Heyes did not have such authority, making the Agreement an *ultra vires* act, and thus invalid. (See Pl.'s Br. in Supp. Mot. for Reconsid. 8–10). Relying on a number of newly-presented documents, the plaintiff states that Paula Heyes had assigned a 10% interest to her husband, David Heyes, prior to her entering the Agreement with the defendants. (Pl.'s Br. in Supp. Mot. for Reconsid. 9). The plaintiff also informs the Court that the "10% interest was probably never transferred back" to Paula Heyes, and that the Agreement was made without David Heyes signature. (Pl.'s Br. in Supp. Mot. for Reconsid. 9). Thus, the plaintiff argues that David Heyes did not consent to the Agreement, making the Agreement and *ultra vires* act and, therefore, invalid. (Pl.'s Br. in Supp. Mot. for Reconsid. 9). Logically flowing from that contention is the argument that, if the Agreement was invalid, then the $435,000 antecedent debt was also invalid. That invalidity would thus mean that BRIC's ultimate $400,000

transfer to the defendants was arguably not of reasonably equivalent value and was, therefore, a fraudulent transfer under WUFTA.[1]

## 2. Discussion

As noted above, the Court accepts the plaintiff's contention that if David Heyes owned 10% of BRIC at the execution of the Agreement and did not consent to the terms of the Agreement, then Paula Heyes' entering the Agreement was an invalid *ultra vires* act, making BRIC's $400,000 transfer fraudulent under WUFTA.

Thus, having established the legal significance of the facts and evidence the plaintiff now hopes to introduce, the ultimate question that the Court must answer is whether it should grant the plaintiff's motion for reconsideration based upon the newly-offered evidence.

Simply put, if the Court considers this new evidence, then it must overturn its prior grant of summary judgment. If Paula Heyes' entering the Agreement was *ultra vires*, then—from a legal standpoint—BRIC's $400,000 transfer would have been made in exchange for a 12.5% interest in BRIC, as opposed to having been made in satisfaction of an antecedent debt. As such, the reasonable equivalency of the $400,000 transfer to the 12.5% interest in BRIC would be an issue of material fact to be decided by a factfinder.

On the other hand, if the Court finds that it should disregard this new evidence, then its prior order of summary judgment may stand. The plaintiff does not quarrel with the Court's original analysis. Rather, the plaintiff accepts that the analysis in the Court's October 4, 2011 order is in fact correct, unless the Court considers the newly-offered evidence calls into dispute the validity of the Agreement. (*See* Pl.'s Br. in Supp. Mot. for Reconsid. 8–11 (setting forth the plaintiff's argument that the newly-offered evidence should change the Court's analysis, but never arguing that the Court's original decision was incorrect)).

Thus, the Court turns to the primary issue of whether it should grant the plaintiff's motion for reconsideration, take into account newly-offered evidence, and consequently overturn its prior grant of summary judgment on the plaintiff's first and third claims.

### 2.1 Standard for Reconsideration

District courts have broad discretion to grant or deny motions for reconsideration. *Caisse Nationale de Credit Agricole v. CBI Industries*, 90 F.3d 1264, 1270 (7th Cir.1996). A district court's decision on a motion for reconsideration will not be reversed on appeal "absent an abuse of that discretion." *Id.*

Despite that broad discretion, district courts should grant motions for reconsideration only in limited circumstances. That is because " '[m]otions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence.' " *Id.*, at 1269 (7th Cir.1996) (quoting *Keene Corp. v. Int'l Fidelity Ins. Co.*, 561 F.Supp. 656, 665 (N.D.Ill.1982), *aff'd*, 736 F.2d 388 (7th Cir. 1984); citing *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987)). As the plaintiff correctly states, reconsideration is appropriate only in circumstances "where there is (1) an intervening change in controlling law; (2) the availability of new evidence or an expanded factual record; or (3) a need to correct clear error [of fact or law] or to prevent

---

1. As the Court discusses below, the reasonable equivalency of the $400,000 transfer and the 12.5% BRIC interest exchanged by the

defendants would be an issue of material fact to be decided by a factfinder.

manifest injustice." (Pl.'s Br. in Supp. Mot. for Reconsid. 8 (citing *Whitford v. Boglino*, 63 F.3d 527, 530 (7th Cir.1995), *Geneva International Corp. v. Petrof, Spol, S.R.O.*, 608 F.Supp.2d 993, 997–98 (N.D.Ill.2009), *Bank of Waunakee v. Rochester Cheese Sales*, 906 F.2d 1185, ·1191 (7th Cir.1990), *Rothwell Cotton Co.*, 827 F.2d at 251, *United States v. Petersen Sand & Gravel, Inc.*, 806 F.Supp. 1346, 1360 (N.D.Ill.1992))).

## 2.2 Application of Reconsideration Standard to Plaintiff's Newly–Offered Evidence

Because the plaintiff has not argued that there has been any intervening change in the controlling law, the Court will look only to whether the plaintiff's newly-offered evidence qualifies for reconsideration under either the second or third of the above-listed circumstances.

### 2.2.1 Availability of New Evidence or an Expanded Factual Record

Motions for reconsideration " 'cannot in any case be employed as a vehicle to introduce new evidence that could have been adduced during the pendency of the summary judgment motion.' " *Caisse Nationale*, 90 F.3d at 1269 (quoting *Keene Corp.*, 561 F.Supp. at 665; citing *DeBruyne v. Equitable Life Assurance Soc'y*, 920 F.2d 457, 471 (7th Cir.1990), *Manor Healthcare Corp. v. Guzzo*, 894 F.2d 919, 922 n. 4 (7th Cir.1990)). To support such a motion, the moving party must show not only that: (1) the evidence is newly discovered; but also that, (2) " 'it could not with reasonable diligence have discovered and produced such evidence' " while the summary judgment motion was pending. *Caisse Nationale*, 90 F.3d at 1269 (quoting *Engelhard Indus., Inc. v. Research Instrumental Corp.*, 324 F.2d 347, 352 (9th Cir. 1963), *cert. denied*, 377 U.S. 923, 84 S.Ct. 1220, 12 L.Ed.2d ·215 (1964)). In other words, it is not enough to show only that

one has obtained new evidence; rather, the party moving the Court for reconsideration must also show that the evidence was not reasonably available at the time the original summary judgment motion was pending.

The plaintiff cannot satisfy that requirement here. While the plaintiff has presented the Court with new evidence, the plaintiff has not offered a satisfactory explanation as to how or why the newly-offered evidence could not, with reasonable diligence, have been discovered and produced during the pendency of the original summary judgment motion. (Pl.'s Br. in Supp.· Mot. for Reconsid. 8–10). To be sure, the plaintiff does offer new evidence that David Heyes may have owned a portion of BRIC at the time the Agreement was entered, and that he may not have consented to the Agreement. (Pl.'s Br. in Supp. Mot. for Reconsid. 8–9).

But that alone is not enough. In an attempt to justify its failure to initially produce this evidence, the plaintiff argues that "more than two years had passed between the production of the evidence in the bankruptcy litigation." (Pl.'s Br. in Supp. Mot. for Reconsid. 9). The plaintiff also informs the Court that "[i]t was only by an indirect path ... that counsel was led back to these documents." (Pl.'s Br. in Supp. Mot. for Reconsid. 9). However, as far as the Court can tell, the documents were disclosed in discovery and in possession of the plaintiff during the pendency of the defendants' motion for summary judgment. In fact, rather than agreeing to the defendants' proposed findings of fact as related to Paula Heyes' entering the Agreement (*see* Pl.'s Br. in Supp. Mot. for Reconsid. 3–4), it seems that the plaintiff could have fairly easily (*and should have*) located these documents and disclosed them to the Court as evidence to support a denial of those proposed facts. With rea-

sonable diligence, the plaintiff could have discovered and disclosed those documents to the Court while that motion was pending. Thus, given that the plaintiff had access to the documents at that time, its having unreasonably overlooked them is not adequate to justify this Court's reconsideration.

"A party seeking to defeat a motion for summary judgment is required to 'wheel out all its artillery to defeat it,'" and any "[b]elated factual or legal attacks are viewed with great suspicion." *Caisse Nationale,* 90 F.3d at 1270 (quoting *Employers Ins. of Wausau v. Bodi–Wachs Aviation Ins. Agency,* 846 F.Supp. 677, 685 (N.D.Ill. 1994); citing *Ryan v. Chromalloy Am. Corp.,* 877 F.2d 598, 603–04 (7th Cir.1989), *In re Oil Spill,* 794 F.Supp. 261, 267 (N.D.Ill.1992), *aff'd,* 4 F.3d 997 (7th Cir. 1993), *Publishers Resource v. Walker–Davis Publications,* 762 F.2d 557, 561 (7th Cir.1985), *Bally Export Corp. v. Balicar Ltd.,* 804 F.2d 398, 404 (7th Cir.1986)). Here, it seems that, by its own unreasonable mistake, the plaintiff left its pistol at home before heading off to the duel. Absent some justification for that mistake, which the plaintiff has not presented, the Court will not grant the plaintiff a rematch.

### 2.2.2 Need to Correct Clear Error of Fact or Law or to Prevent Manifest Injustice

Having found that the availability of new evidence does not support the plaintiff's motion for reconsideration, the Court now turns to whether it should grant that motion in order to correct "clear" error or to prevent "manifest" injustice.

In the situation at hand, the Court does not believe that the newly-presented evidence shows that such a "clear" error of fact exists or that "manifest" injustice will result if the Court refuses to reconsider the matter. It is not, in fact, "clear" that David Heyes: (1) owned any portion of

BRIC at the time the Agreement was entered; or that (2) David Heyes did not support such Agreement. Actually—to the contrary—the plaintiff openly admits that it is not clear that David Heyes held a membership interest at the time the Agreement was entered; the plaintiff twice states only that David Heyes "probably" or "likely" never reconveyed his interest to Paula Heyes. (Pl.'s Br. in Supp. Mot. for Reconsid. 6, 9). Furthermore, the plaintiff presents no evidence that David Heyes did not actually consent to the Agreement. Looking only to the dealings between David and Paula Heyes, which consist of a joint filing of bankruptcy (Nordholm Aff., Ex. C) as well as the transfer of a 10% interest in BRIC for what appears to be no consideration (Nordholm Aff., Ex. B), it is clear that the two individuals are closely allied. While it cannot be said definitively that David Heyes consented to the Agreement, the plaintiff also has not shown any evidence to establish that he did not so consent. Thus, there is no "clear" error of fact that would be rectified by granting the plaintiff's motion for reconsideration.

Further, the Court does not believe that any "manifest" injustice will result if it denies the motion. Accepting the plaintiff's definition of "manifest" as "evident, clear, plain ..." the Court finds that no clear injustice will be perpetrated by refusing to reconsider its initial order. (Pl.'s Br. in Supp. Mot. for Reconsid. 10 (citing *Webster's New Universal Unabridged Dictionary Deluxe Second Edition,* 1983)). The plaintiff argues that "[i]t should be evident, plain and obvious to one's understanding that it is wrong to dismiss Plaintiff's First and Third causes of action based on an act done in violation of state law." (Pl.'s Br. in Supp. Mot. for Reconsid. 11). But, the Court must again state that it does not believe that such a violation is in the least evident, plain, or clear

from the newly-presented evidence. At best, that evidence draws into question whether the Agreement was invalid; but, such a conclusion is certainly not clear.

In reality, the Court finds it would be a much clearer injustice to strike an otherwise validly-entered contract on the purely legal-fictional grounds that David Heyes temporarily held a membership interest in BRIC at a time when his closely-related ally, Paula Heyes, with whom he appears to have had a continuing close business relationship, entered that contract with the defendants. The terms of the contract, so far as the Court can tell, were fair. Thus, it would be just as much (if not more) of a clear injustice to now strike that contract on purely technical grounds, as it would be to find the contract invalid under state law based on the fairly flimsy, late-arriving evidence the plaintiff now offers.

### 3. Conclusion

For these reasons, the Court concludes that it should deny the plaintiff's motion for reconsideration. The plaintiff has not offered any compelling reason why its newly-offered evidence qualifies for reconsideration under any of the limited circumstances acknowledged in this circuit's case law. Therefore, the Court denies the plaintiff's motion, leaving intact the Court's prior order granting summary judgment to the defendants on the plaintiff's first, second, third, and fifth claims.

Accordingly,

**IT IS ORDERED** that the plaintiff's motion for reconsideration (Docket # 48) of the Court's October 4, 2011 order (Docket # 45) be and the same is hereby **DENIED.**